# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-KA-00761-COA

JAIRUS COLLINS A/K/A JAIRUS J. COLLINS                           APPELLANT

v.

STATE OF MISSISSIPPI                                             APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 03/27/2013 |
| TRIAL JUDGE: | HON. ROBERT B. HELFRICH |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | MICHAEL ADELMAN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: MELANIE DOTSON THOMAS |
| DISTRICT ATTORNEY: | PATRICIA A. THOMAS BURCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF MURDER AND SENTENCED AS A HABITUAL OFFENDER TO LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITHOUT POSSIBILITY OF PAROLE OR EARLY RELEASE |
| DISPOSITION: | AFFIRMED - 10/07/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE IRVING, P.J., BARNES AND CARLTON, JJ.

### CARLTON, J., FOR THE COURT:

¶1.     A Forrest County jury found Jairus Collins guilty of murder pursuant to Mississippi Code Annotated section 97-3-19(1)(a) (Rev. 2006).  Collins now appeals his conviction and raises the following issues:  (1) whether the circuit court erred by denying his motion to suppress his statement to police; (2) whether the Double Jeopardy Clause bars his retrial on the charge of murder; (3) whether the circuit court erred by refusing him the opportunity to

challenge his statement during closing arguments; (4) whether the circuit court erred by allowing a witness to testify as an expert over his objections; (5) whether he was unconstitutionally sentenced as a habitual offender; and (6) whether his conviction is against the overwhelming weight of the evidence. Finding no error, we affirm.

**FACTS**

¶2. On December 9, 2011, Ebony Jenkins's body was discovered behind a building in Hattiesburg, Mississippi. During the course of their investigation, police officers identified Collins as a suspect in Jenkins's murder. In November 2012, a grand jury indicted Collins as a habitual offender for Count I, the murder of Jenkins, and Count II, possession of a weapon by a convicted felon. The circuit court granted Collins's motion to sever the offenses charged in his indictment.

¶3. At Collins's murder trial, the State called Louis Dixon, Jenkins's father, as a witness. Dixon testified that he drove to Hattiesburg and filed a missing person's report after receiving a telephone call that his daughter failed to report to work. On the same day that Dixon filed the report, the Hattiesburg Police Department received a phone call about a homeless person sleeping behind a daycare. When police officers arrived at the scene, they discovered the person was actually Jenkins, who had died as a result of two gunshot wounds.

¶4. The jury also heard testimony from Craig Mitchell, who lived in a house behind the daycare. Mitchell testified that on the night of December 7, 2011, he was smoking a cigarette on his porch when he heard three or four gunshots. Mitchell testified that the gunshots sounded very close, and he immediately locked himself inside his house and peered out the window. According to Mitchell's testimony, he saw a man running away from the area.

2

Mitchell testified that the man was of medium build and wore a "hoodie-type sweater" that was "[e]ither blue or light gray or black."

¶5.    The State showed Mitchell a gray sweater belonging to Collins that police officers discovered in the woods. As later testimony revealed, police officers found the sweater wrapped around the suspected murder weapon in a bag hidden in the woods. Upon seeing the gray sweater, Mitchell testified that he was "[p]retty positive" that it was the same sweater he saw the man wearing the night of December 7, 2011.

¶6.    The State also called Jenkins's friend, Jessie Miles, as a witness. Miles testified that he and Jenkins spoke around 9:30 p.m. on December 7, 2011, about riding to work together the next morning. However, Miles testified that Jenkins failed to show up at work the next day. Miles also provided testimony regarding a gun that he bought in February 2010. According to Miles's testimony, he began experiencing problems with the gun and Collins's brother, Joshia, told Miles that Collins could fix the gun. Miles testified that he gave the gun to Collins around November 2011 after Collins confirmed that he could repair the gun. During Miles's testimony, the State showed him an exhibit, which Miles identified as the gun he bought and gave to Collins to repair. Although the gun's serial number was no longer visible at the time of trial, Miles testified that the serial number had been clearly visible when he gave the gun to Collins in November 2011.

¶7.    Collins's father, Melvin, also provided trial testimony about the time period surrounding Jenkins's murder. Melvin testified that his sons stopped by his house on either December 7, 2011, or December 8, 2011. Melvin testified that he picked up a bag inside his sons' vehicle and noticed that the bag felt "a little bit weighty." Although Melvin did not

3

know what the bag contained, he told his sons that the bag made him feel uncomfortable. After Melvin instructed his sons to take the bag and its contents away from his house, Collins and Joshia took the bag and left.

¶8. The jury heard additional testimony from Collins's brother, Joshia, who stated that both he and Collins had been friends with Jenkins. Joshia testified that he lived at an apartment complex located within walking distance of the place where the police found Jenkins's body. Joshia testified that his brother called him around 10:54 p.m. on December 7, 2011, from their sister's phone. Collins arrived at Joshia's apartment complex later that night. According to Joshia's testimony, Collins wore a gray hoodie when he arrived at the apartment complex and appeared to be out of breath.

¶9. Joshia testified that he and his brother stopped by their father's house the next day. Joshia confirmed that his father told him and his brother to get rid of the bag they had in their car. Joshia maintained during his trial testimony that he neither looked inside the bag nor saw his brother with a weapon at any point in time. According to the statement he gave to police officers, however, Joshia said that, upon feeling the bag, he could tell the bag contained a weapon. Joshia also told officers that, when he and Collins left their father's house, they drove along Highway 59, and Collins hid the bag in the woods.

¶10. The State called two detectives as witnesses, and both men testified that Joshia led them and another officer to the location where Collins hid the bag in the woods. The detectives further testified that the bag contained a gray hoodie wrapped around a gun. Although the gun's serial number was partially scratched off, a crime scene investigator examined the gun and determined it was the gun registered to Miles. After performing

4

additional tests, a forensic scientist concluded that the gun fired the shell casing police officers found near Jenkins's body.

¶11. In addition to finding the shell casing at the crime scene, officers discovered Jenkins's cell phone and car keys on her body. Jenkins's phone records revealed that the last call she received came from a phone owned by Collins's father. Police learned that Collins's sister normally used the phone but that she allowed Collins to use the phone around the time of Jenkins's murder. When Detective Joey Scott interviewed Collins, Collins confirmed that he had possession of the phone around the time of Jenkins's murder.[1]

¶12. Detective Scott testified that Collins initially told officers he did not know Jenkins very well and was working the night of December 7, 2011. Officers subpoenaed Collins's work schedule, however, which showed that Collins was not at work on December 7, 2011. After officers showed Collins some phone records for December 7, 2011, Collins admitted to having contact with Jenkins that night. Detective Scott testified that Collins then told officers that Jenkins called him and asked for a ride. However, as Detective Scott stated in his testimony, officers had already learned that Jenkins's car was working when she was killed, that her car was parked within walking distance of her location, and that she had her

_____

[1] Through his counsel, Collins submitted a letter to this Court on June 30, 2014, asserting that the United States Supreme Court's recent decision in *Riley v. California*, 134 S. Ct. 2473 (2014), prohibits the search of a cell phone of a person who is arrested. In the present case, however, officers only searched cell phones belonging to Collins's father and to Jenkins. Furthermore, Collins failed to object at trial to the admission into evidence of the cell-phone records. He instead only objected to Officer Casey Sims's testimony explaining the cell-phone records, claiming that the testimony constituted expert testimony. The record therefore reflects that Collins failed to preserve for appeal any objection regarding the search of his father's cell phone or the admission into evidence of the cell-phone records.

5

car keys in her pocket. After further questioning, Collins told officers that he arrived at Jenkins's location on December 7, 2011, to pick her up but could not find her.

¶13. Based on the phone records they obtained, officers determined that Collins and Jenkins exchanged several phone calls and text messages the night of December 7, 2011. Detective Casey Sims testified that he used the cell-phone records to create a map showing the coordinates of each phone call and text message. Detective Sims further testified that the map indicated that Jenkins's and Collins's cell phones moved geographically closer to each other as the night progressed. Detective Sims further testified that, at the time of the last few communications, Collins and Jenkins were both in the area where officers later found Jenkins's body.

¶14. After hearing the evidence and testimony presented at trial, the jury found Collins guilty of Jenkins's murder. Finding Collins to be a habitual offender pursuant to Mississippi Code Annotated section 99-19-83 (Rev. 2007), the circuit court judge sentenced Collins to life in prison in the custody of the Mississippi Department of Corrections, with no possibility of parole or early release. Following his conviction and sentencing, Collins filed a motion for a judgment notwithstanding the verdict or, in the alternative, a new trial. The circuit court judge denied Collins's motion, and Collins now appeals to this Court.

**DISCUSSION**

I. **Whether the circuit court erred by denying Collins's motion to suppress his statement to police.**

¶15. Collins contends that police officers violated his constitutional right to counsel during a pretrial interrogation and, therefore, the circuit court judge should have granted his motion

6

to suppress his statement.

¶16.    The Mississippi Supreme Court has previously stated:

> Findings by a trial judge that a defendant confessed voluntarily, and that such confession is admissible[,] are findings of fact.  As long as the trial judge applies the correct legal standards, his decision will not be reversed on appeal unless it is manifestly in error, or is contrary to the overwhelming weight of the evidence.

*Neal v. State*, 57 So. 3d 1271, 1276-77 (¶14) (Miss. 2011) (internal citations and quotation marks omitted).

¶17.    In *Barnes v. State*, 30 So. 3d 313, 316-17 (¶8) (Miss. 2010), our supreme court also provided the following guidance:

> This Court will reverse a trial court's denial of a motion to suppress only if the ruling is manifest error or contrary to the overwhelming weight of the evidence.  Under *Miranda v. Arizona*, 384 U.S. 436, [479] (1966), custodial interrogation must be preceded by advising the defendant of his right to remain silent and his right to an attorney.  Upon invocation of the right to remain silent, the interrogation must cease.  If the defendant invokes his right to counsel, the interrogation must cease until an attorney is present.  If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.  Once a defendant asks for counsel, he cannot be interrogated further until counsel has been made available, **unless the accused himself initiates further communication, exchanges, or conversations with the police**.

(Emphasis added and internal citations and quotation marks omitted).

¶18.    In the present case, police officers identified Collins as a suspect in Jenkins's murder and brought him in for questioning.  Detective Sims and Detective Scott were both present during Collins's interrogation, which was recorded by both audio and video.  After Detective Sims read Collins his *Miranda* rights, Collins waived his rights.  Detective Sims proceeded

7

to question Collins until Collins stated that he would "rather speak to a lawyer." Following Collins's declaration, the questioning immediately ceased, and the detectives exited the room.

¶19.   As the record reflects, about five minutes elapsed, and then Collins knocked on the door. When Detective Scott opened the door, Collins began speaking to him. The following exchange took place:

| | |
|---|---|
| Detective Scott: | I'll be more than happy to talk to you, but I can't right now. |
| Collins: | Right. |
| Detective Scott: | You know, but you know if you want to talk[,] man, I'll sit right here and listen. |
| Collins: | When can they, how long they going [to] have to hold me for . . . questioning and talking? |
| Detective Scott: | Well[,] I mean right now like I said, we can't do nothing because you said you wanted your lawyer. |
| . . . . | |
| Detective Scott: | That's your right you know, you don't want to talk. |
| Collins: | You ask[ed] me about guns and all of that. |
| Detective Scott: | Let me ask you something.  If I didn't ask you about a gun[,] would you talk to me? |
| . . . . | |
| Detective Scott: | Let me ask you this.  Would you talk to me [if] we just sit here and talk? |
| Collins: | Yeah, yeah[,] I can talk. |
| . . . . | |

8

| Collins: | I can tell you what I know. |
|---|---|
| Detective Scott: | Wait now, hold up[,] man[,] before we—I can't—like I said, I have to do the *Miranda* form over. |
| . . . . | |
| Detective Scott: | Hey, if you want to do that, let me get another form, we'll talk[,] and I'll let you talk. |
| Collins: | Alright[,] I'll do that. |

The interview transcript reflects that Detective Scott then left the room. When he returned, Detective Scott asked, "So you say you'll talk to me without your lawyer[?]" Collins then responded affirmatively, and the interview continued. On appeal to this Court, Collins asserts that Detective Scott's failure to re-advise him of his *Miranda* rights and obtain a new waiver of those rights proves fatal to the State's case.

¶20. At the hearing on Collins's motion to suppress his statement, the circuit court judge found the following:

> While it would probably be a better practice for the officer to re-*Mirandize* the [D]efendant, the fact that such a short period of time did elapse, the [D]efendant was well aware of his rights. In fact, the [D]efendant exercised his rights. Communication ended. The officer left the room, and then the [D]efendant initiated contact with the officer. Under those facts, I'm going to deny your motion [to suppress].

¶21. Based on a review of the record, we find no abuse of discretion in the circuit court's finding that Collins received a *Miranda* warning and then knowingly and intelligently waived his constitutional rights. As the interview transcript reflects, Detective Sims read Collins his rights, and Collins signed a form acknowledging this fact. Collins then read aloud and signed a waiver of his rights. The waiver stated that Collins understood his rights; that he was

9

willing to make a statement and to answer questions without counsel present; that he understood his actions; and that no promises, pressure, or threats had been used to induce him to talk. At the hearing on Collins's motion to suppress, Detective Sims and Detective Scott both testified that Collins did not appear intoxicated or unaware of his circumstances during the interview. Both detectives also testified that Collins was able to speak intelligently, and neither one noticed an impairment that would have prevented Collins from freely, knowingly, and voluntarily providing a statement.

¶22. The record further reflects no abuse of discretion in the circuit court's determination that, after invoking his right to counsel, Collins initiated a new contact with police officers and then freely and voluntarily provided a statement to the officers. *See Barnes*, 30 So. 3d at 316-18 (¶¶8, 15).[2] As revealed by testimony and the interview transcript, after Collins invoked his right to counsel, Detective Sims and Detective Scott exited the interview room. Approximately five minutes later, Collins rose from his chair and knocked on the door. The record reflects that, when Detective Scott opened the door, Collins initiated a new conversation with Detective Scott. More than once, Detective Scott reminded Collins that he was unable to further discuss the investigation since Collins had invoked his right to counsel. However, the record reflects that Collins persisted in speaking to Detective Scott and agreed to sit back down and continue their conversation without the presence of counsel.

¶23. After reviewing the record and applicable caselaw, we cannot find that the circuit

---

[2] *See also Neal*, 57 So. 3d at 1280 (¶28) ("The trial court concluded that Neal had initiated the contacts. [The supreme court] discern[ed] no basis to overrule the court's factual finding. A transcript of the suppression hearing reveal[ed] that the trial court was aware of the caselaw involved and appropriately examined and applied the law.").

court's denial of Collins's motion to suppress his statement was contrary to the overwhelming weight of the evidence or resulted in manifest error. *See Barnes*, 30 So. 3d at 316-17 (¶8). The record supports a finding that Collins knowingly and intelligently waived his constitutional rights and that he freely and voluntarily gave a statement to police officers. *See id.* at 318 (¶15). As a result, this issue lacks merit.

## II. Whether the Double Jeopardy Clause bars Collins's retrial on the charge of murder.

¶24. In his next assignment of error, Collins continues to challenge the admission into evidence of his pretrial statement. Collins asserts that, without his statement, no reasonable juror could have found that sufficient evidence existed to convict him of Jenkins's murder. Collins further argues that "the grant[] of a new trial based on the insufficiency of the evidence triggers the [D]ouble [J]eopardy [C]lause of the United States Constitution and bars [his] retrial" for Jenkins's murder.

¶25. As previously stated, we find no abuse of discretion or manifest error in the circuit court's admission of Collins's statement into evidence. Therefore, this assignment of error is moot since we find no new trial is warranted. Relative to Collins's argument, however, we acknowledge the overwhelming evidence in the record that supports Collins's guilt. Even without the pretrial statement to police officers, the record reflects that the State presented sufficient evidence to support Collins's murder conviction.[3]

¶26. According to Mitchell's testimony, on the night of December 7, 2011, he heard several gunshots and then saw a man wearing a hoodie running away from the area. The

---

[3] *See Bush v. State*, 895 So. 2d 836, 843 (¶16) (Miss. 2005).

same night, Collins arrived at his brother's apartment complex out of breath and wearing a gray hoodie. As Joshia, Collins's brother, testified, he lived in an apartment complex located within walking distance of the area where police discovered Jenkins's body. Joshia also led police to a spot in the woods where Collins hid a gun. When police officers searched the area, they found the gun used to kill Jenkins wrapped in a gray hoodie belonging to Collins. Furthermore, Jenkins's friend, Miles, testified that he gave the gun to Collins several weeks prior to Jenkins's murder so Collins could repair the weapon. The jury also heard testimony from Detective Sims that, on the night of December 7, 2011, Collins and Jenkins exchanged several cell-phone communications and that their cell phones moved geographically closer to each other as the night progressed.

¶27. The circuit court judge found that Collins knowingly and intelligently waived his constitutional rights and then freely and voluntarily gave a statement to police officers. As previously discussed, the record reflects no manifest error in the circuit court's denial of Collin's motion to suppress his statement.[4] In addition, the record reflects that the State presented sufficient evidence, other than Collins's statement, upon which a reasonable juror could find Collins guilty of Jenkins's murder. As a result, we find no merit to Collins's argument that the Double Jeopardy Clause bars his retrial for the charge of murder.

### III. Whether the circuit court erred by refusing Collins the opportunity to challenge his statement during closing arguments.

¶28. Collins next argues that the circuit court judge erred by refusing to let him fully argue before the jury that police officers failed to honor his request for counsel. Collins asserts that

---

[4] *See Neal*, 57 So. 3d at 1277 (¶14).

the circuit court judge's ruling prejudiced his ability to present a fair and complete defense and constituted reversible error. In addressing Collins's argument that the circuit court improperly restricted his attorney's closing argument, we apply an abuse-of-discretion standard of review. *See Easterling v. State*, 2010-KA-02075-COA, 2012 WL 1592176, at *3 (Miss. Ct. App. May 8, 2012).

¶29. During closing argument, Collins's attorney made the following comments:

> Now, . . . you have the opportunity to take this rather lengthy transcript of the [D]efendant's statement back with you. . . . I wanted to point out that in this statement you will see at Page 12 where the [D]efendant asks to speak to a lawyer twice. That on Page 13 he again requested to speak with a lawyer. Page 14, [he] again asked to speak with a lawyer. You heard the testimony. There never was a lawyer present . . . .

¶30. At this point during the defense's closing argument, the State objected. In response to the objection, the circuit court judge stated, "[Collins's] statement, as previously ruled by this [c]ourt, is admissible." Following the circuit court judge's statement, Collins's attorney resumed his closing argument, drawing the jury's attention to different portions of the interview transcript and using those portions to bolster his argument. On appeal, Collins argues that the circuit court judge's ruling prevented him from fully challenging the truthfulness and voluntariness of his statement. The State, however, contends that the defense was attempting to improperly "comment on the [circuit] court's pretrial ruling regarding the admissibility of [Collins's] confession."[5]

¶31. In *Wilson v. State*, 451 So. 2d 724, 726 (Miss. 1984), our supreme court provided the

---

[5] As our caselaw holds, "[o]nce the judge [has] made his decision, the issue of admissibility [is] no longer a question." *Malone v. State*, 829 So. 2d 1253, 1259 (¶16) (Miss. Ct. App. 2002).

following guidance regarding a defendant's pretrial statement:

> The admissibility of a confession is for the determination of a trial judge. The admissibility of the confession, however, is to be distinguished from the issue of its credibility and its weight. The distinction has been enunciated by this Court. In *McNeal v. State*, 405 So. 2d 90[, 92] (Miss. 1981), this Court stated that "the competency of a confession as evidence is for the court to decide as a matter of law, while the weight and credibility of a confession is for the jury to decide along with other testimony and physical evidence."

> Once a confession is admitted into evidence, a defendant is entitled to submit evidence and have the jury pass upon the factual issues of its truth and voluntariness and upon its weight and credibility. The defendant may offer proof to show that the confession is untrue and explain why he made the untrue statement.

> Once this rebuttal or impeachment testimony is offered, then the jury may conclude that the confession, though found by the court to be voluntary, is untrue and not entitled to any weight. Confessions are not conclusive and may be weighed as to their credibility under the circumstances by the jury. This is a matter for the jury and not the court.

(Internal citations omitted).

¶32.	In the present case, the circuit court judge's statement responded to the State's objection and emphasized the circuit court's prior ruling on the admissibility of Collins's statement. As the record reflects, the circuit court's statement failed to reference any factual issues within the jury's determination. By specifically reminding the defense that the admissibility of Collins's statement had previously been determined, the circuit court judge limited his ruling and rendered no comment upon the truth, voluntariness, weight, or credibility of Collins's statement. Furthermore, the record reflects that, after the State's objection and the circuit court judge's response, the defense continued to attack the truthfulness and credibility of Collins's pretrial statement.

14

¶33. The record also reflects that the circuit court judge gave the jury the following instruction:

> You[, the jurors,] are the sole judges of the facts in this case. Your exclusive province is to determine what weight and credibility will be assigned to the testimony and supporting evidence of each witness in this case. You are required and expected to use your good common sense and sound judgment in considering and weighing the testimony of each witness who has testified in this case.
>
> **You may consider [the] Defendant's statement in the light of the manner by which you find that it was obtained, and [you may] give [it] such weight and credibility as you think it is entitled.**

(Emphasis added).

¶34. Based on our review of the record and applicable caselaw, we find no abuse of discretion in the circuit court's response to the State's objection to the closing-argument comments of Collins's attorney. *See Easterling*, 2012 WL 1592176, at *3. As the record reflects, the circuit court judge placed no prohibition on the defense's ability to attack the weight and credibility of Collins's pretrial statement, and he properly instructed jurors that it was their duty to determine these factual issues when considering Collins's statement. Therefore, we find that this assignment of error lacks merit.

## IV. Whether the circuit court erred by allowing a witness to testify as an expert over Collins's objections.

¶35. Collins next argues that the circuit court judge erred by allowing Detective Sims to testify as a cell-phone expert and by overruling Collins's objections to the exhibits admitted into evidence during Detective Sims's testimony. As our caselaw establishes, we review a circuit court's decision to admit or exclude evidence for abuse of discretion. *Malone v. State*, 73 So. 3d 1197, 1201 (¶12) (Miss. Ct. App. 2011).

15

¶36. During Collins's trial, the State called Detective Sims to testify as a lay witness. Rule 701 of the Mississippi Rules of Evidence, which governs testimony by lay witnesses, states:

> If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to the clear understanding of the testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702 [of the Mississippi Rules of Evidence].

¶37. At trial, Detective Sims testified that he attended a sixteen-hour course about the cellular technology used in law enforcement. Detective Sims stated that the course taught participants how to deal with telephone companies, interpret phone records, and enter phone-record information into a mapping software program. Using the software he received from his cellular-technology course, Detective Sims testified that he was able to create a map of Jenkins's and Collins's cell-phone communications for the night of December 7, 2011.

¶38. According to Detective Sims's testimony, the cell-phone records indicated that Jenkins and Collins exchanged several calls and text messages the night of December 7, 2011. Detective Sims used the cell-phone records to plot the latitude and longitude coordinates of these communications and to show the location of the cell phones at the time each communication was made. Detective Sims testified that the resulting map indicated that Jenkins's and Collins's cell phones moved geographically closer to each other as the night progressed. Detective Sims further testified that, at the time of the last few communications, Collins's and Jenkins's cell phones were both in the area where police later found Jenkins's body.

¶39. Collins objected to Detective Sims's testimony, arguing that Detective Sims had not

been established as an expert witness qualified "to explain or reach any kind of expert conclusions regarding [the] phone records . . . ." Collins also objected to the admission into evidence of the map Detective Sims created with his computer-software program. Collins asserted that the State failed to show that Detective Sims possessed the expertise to accurately create such a document. In overruling the defense's objections, the circuit court judge noted that Detective Sims created his map "by simply putting in the location in a software program."

¶40.   In *Russ v. Safeco Insurance Co. of America*, No. 2:11CV195-KS-MTP, 2013 WL 1310501, at *29 (S.D. Miss. Mar. 26, 2013), the district court discussed whether certain testimony about cell-phone records constituted lay testimony or expert testimony. In addressing the issue, the district court judge wrote:

> Numerous courts have found testimony regarding cell[-]phone records and the location of cell[-]phone towers to fall outside the scope of expert[-]witness testimony. As noted by one district court:
>
>> A reasonably competent layperson, given a small amount of information, could easily examine a cell-phone record and determine the identity of the cell tower that handled a particular call. That same layperson, given a map of cell towers in the area, could identify the approximate location of the cell phone at the time the call was made or received.

(Internal citations omitted).

¶41.   One of the cases cited by the *Russ* court was *United States v. Baker*, 496 F. App'x 201 (3d Cir. 2012). In *Baker*, the Third Circuit Court of Appeals discussed a law enforcement officer's testimony that he used computer software to create a map of the defendant's and another person's locations from records of their cell-phone usage. *Id.* at 204. The defendant

17

argued on appeal that "the agent's testimony required specialized knowledge that was not in the jury's possession and, therefore, the agent's testimony was inadmissible." *Id.* However, "[g]iven the omnipresent nature of computer[-]mapping software in today's society[,]" the Third Circuit found that "the agent's testimony about his use of the mapping software was not expert testimony[.]" *Id. See also United States v. Henderson*, No. CR 10-117 BDB, 2011 WL 6016477, at *5 (N.D. Okla. Dec. 2, 2011) (finding an agent's testimony that he simply reviewed the defendant's cell-phone records with the knowledge that "one column . . . identified the cell tower that was nearest to the location of the cell phone at the time a particular call was made or received" and "created and testified about a map showing the alleged location of [the defendant's] cell phone when it made or received calls" failed to constitute expert testimony).

¶42.    After reviewing the relevant caselaw, we find that Detective Sims failed to provide any expert testimony "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." M.R.E. 701. Instead, the record reflects that Detective Sims simply reviewed the cell-phone records obtained during the investigation of Jenkins's murder and entered information from those records into his computer-mapping software. As other courts have previously found:

> A reasonably competent layperson, given a small amount of information, could easily examine a cell-phone record and determine the identity of the cell tower that handled a particular call. That same layperson, given a map of cell towers in the area, could identify the approximate location of the cell phone at the time the call was made or received.

*Russ*, 2013 WL 1310501, at *29 (quoting *Henderson*, 2011 WL 6016477, at *5). Because Detective Sims's testimony failed to constitute expert testimony under Rule 702, we find no

18

abuse of discretion by the admission into evidence of Detective Sims's testimony or the map he created during the course of his investigation. *See Malone*, 73 So. 3d at 1201 (¶12). Accordingly, this issue lacks merit.

### V. Whether Collins was unconstitutionally sentenced as a habitual offender.

¶43. In his next assignment of error, Collins asserts that the circuit court unconstitutionally sentenced him as a habitual offender under section 99-19-83. While recognizing that Mississippi courts have previously upheld the constitutionality of section 99-19-83, Collins argues that our caselaw either failed to consider or is inconsistent with caselaw from the United States Supreme Court. Collins also contends that section 99-19-83 violates Rule 404(b) of the Mississippi Rules of Evidence.

#### a. United States Supreme Court Precedent

¶44. Collins cites to *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Blakely v. Washington*, 542 U.S. 296 (2004), to support his argument that his sentence as a habitual offender is unconstitutional. In citing *Apprendi*, Collins argues that the case stands for the proposition that "the Fourteenth Amendment of the United States Constitution requires that any fact that increases the penalty for a state crime beyond the statutory maximum [must] be submitted to a jury and proved beyond a reasonable doubt." Collins also asserts that in *Blakely* the Supreme Court held that "an extended sentence, beyond the maximum statutory penalty, could only be imposed by a jury."

¶45. Our review of this issue shows that Collins's reliance on these cases is misplaced. Collins's argument as to the holdings in *Apprendi* and *Blakely* fails to consider pertinent

language used by the Supreme Court in both cases. When read in its entirety, the *Apprendi* rule referenced by Collins states the following:

> **Other than the fact of a prior conviction**, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt. **With that exception**, we endorse the statement of the rule set forth in the concurring opinions in [*Jones v. United States*, 526 U.S. 227, 252 (1999) (Stevens, J., concurring)]: "It is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed.["]

*Apprendi*, 530 U.S. at 490 (emphasis added). In *Blakely*, the Supreme Court reiterated the *Apprendi* rule and found unconstitutional a state sentencing procedure that, after the defendant pled guilty, allowed a trial judge to engage in additional fact-finding for the purpose of enhancing the defendant's punishment. *Blakely*, 542 U.S. at 296.

¶46. In the present case, the circuit court judge found during Collins's sentencing hearing that Collins had several prior convictions. Based solely on these prior convictions, the circuit court judge sentenced Collins as a habitual offender. The record reflects that the circuit court judge made no additional findings of fact. Instead, the sentencing hearing remained limited to proof of Collins's prior convictions. Because the circuit court judge used only Collins's prior convictions to enhance the penalty of the murder conviction, and because the circuit court judge did not engage in additional fact-finding with respect to the crime charged, Collins's enhanced sentencing fails to violate the holdings in *Apprendi* and *Blakely*. As a result, we find no merit to Collins's argument that, based on Supreme Court precedent, his sentence as a habitual offender is unconstitutional.

b.      **Mississippi Rule of Evidence 404(b)**

20

¶47.    Collins also argues that his sentence as a habitual offender violates Rule 404(b), which states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

¶48.    The caselaw Collins cites in support of his argument discusses the offer of other-crimes evidence during a jury trial.[6]  Collins fails to provide any relevant caselaw to demonstrate that Rule 404(b) also applies to a sentencing hearing before a circuit court judge. Collins's failure to cite any relevant authority obviates this Court's obligation to review the issue.  *See Simmons v. State*, 805 So. 2d 452, 487 (¶90) (Miss. 2001).  Therefore, this issue is not properly before this Court and is procedurally barred from our consideration.

### VI.    Whether Collins's conviction is against the overwhelming weight of the evidence.

¶49.    In his final assignment of error, Collins argues that his conviction for Jenkins's murder is against the overwhelming weight of the evidence.  This Court reviews a circuit court's denial of a motion for a new trial for abuse of discretion.  *Griffith v. State*, 123 So. 3d 472, 475 (¶15) (Miss. Ct. App. 2013).  "When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, [this Court] will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to

---

[6] Collins cites *Moore v. State*, 859 So. 2d 379 (Miss. 2003); *Flowers v. State*, 773 So. 2d 309 (Miss. 2000); and *Robinson v. State*, 497 So. 2d 440 (Miss. 1986).  As noted, these cases discuss the admission into evidence of other-crimes evidence during a jury trial.  None of these cases stand for the proposition argued by Collins on appeal to this Court.

stand would sanction an unconscionable injustice." *Bush v. State*, 895 So. 2d 836, 844 (¶18) (Miss. 2005) (citation omitted). In addition, we weigh the evidence in the light most favorable to the verdict. *Id.*

¶50.   As provided by section 97-3-19(1)(a), "[t]he killing of a human being without the authority of law by any means or in any manner shall be murder . . . [w]hen done with deliberate design to effect the death of the person killed, or of any human being . . . ." In the present case, Count I of Collins's indictment charged that, "between[,] on[,] or about December 7, 2011, and December 9, 2011, [Collins] did willfully, feloniously[,] and without the authority of law kill and murder Ebony Jenkins, a human being, with deliberate design to effect the death of Ebony Jenkins . . . ." The circuit court instructed the jury on the elements of murder. To prove its case, the State had to prove the following beyond a reasonable doubt: "(1) [Collins] killed [Jenkins], (2) without authority of law, and (3) with deliberate design to effect her death." *Hogan v. State*, 89 So. 3d 36, 38 (¶8) (Miss. Ct. App. 2011) (citation omitted).

¶51.   As previously discussed, during Collins's trial the State presented overwhelming evidence of Collins's guilt. The State's evidence showed that Collins knew Jenkins, was in close geographical proximity to Jenkins prior to her death, and exchanged several communications with Jenkins prior to her death. As trial testimony revealed, police officers discovered a gun hidden in the woods, and tests confirmed that the gun fired the shell casing found at the crime scene near Jenkins's body. Further testimony revealed that, when police officers found the gun in the woods, it was wrapped in a gray hoodie belonging to Collins. In addition, the jury heard testimony that Collins had possession of the gun for several weeks

22

prior to Jenkins's death and that Collins's brother led police officers to the location in the woods where Collins hid the gun. As our caselaw provides, a determination of the weight and credibility to give to each witness's testimony lies within the sole province of the jury. *Griffith*, 123 So. 3d at 476 (¶17).

¶52. Viewing the evidence in the light most favorable to the verdict, we cannot say that Collins's guilty verdict "is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Bush*, 895 So. 2d at 844 (¶18). As a result, we find no abuse of discretion by the circuit court judge's denial of Collins's motion for a new trial. *See Griffith*, 123 So. 3d at 475 (¶15). Therefore, this issue lacks merit.

¶53. **THE JUDGMENT OF THE FORREST COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE AS A HABITUAL OFFENDER OF LIFE IMPRISONMENT, WITHOUT POSSIBILITY OF PAROLE OR EARLY RELEASE, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., IRVING, P.J., BARNES, ISHEE, MAXWELL AND FAIR, JJ., CONCUR. GRIFFIS, P.J., AND ROBERTS, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. JAMES, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.**