## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

### NO. 2013-KA-01858-COA

MARKEITH D. FLEMING A/K/A  MARKEITH
DARRELL FLEMING

APPELLANT

v.

STATE OF MISSISSIPPI

APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 09/17/2013 |
| TRIAL JUDGE: | HON. C.E. MORGAN III |
| COURT FROM WHICH APPEALED: | ATTALA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES HUNTER NOLAN AIKENS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: SCOTT STUART |
| DISTRICT ATTORNEY: | DOUG EVANS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF COUNT I, MURDER, AND SENTENCED TO LIFE, AND COUNT II, AGGRAVATED ASSAULT, AND SENTENCED TO TWENTY YEARS, WITH THE SENTENCES TO RUN CONSECUTIVELY IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS |
| DISPOSITION: | AFFIRMED - 04/14/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE IRVING, P.J., ISHEE  AND CARLTON, JJ.**

**CARLTON, J., FOR THE COURT**:

¶1.    This appeal proceeds from a judgment of conviction for murder and aggravated

assault  entered against Markeith Fleming following a jury trial in the Attala County Circuit

Court on September 16-17, 2013. The trial court sentenced Fleming to life imprisonment on the charge of murder and ordered him to serve a twenty-year sentence for aggravated assault, with the sentences to run consecutively. The trial court denied Fleming's motion for a judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial. Fleming now appeals, arguing that (1) the trial court erred in denying his motion for a continuance; (2) Fleming received ineffective assistance of counsel; and (3) the verdict was against the overwhelming weight of the evidence. Finding no error, we affirm.

**FACTS**

¶2. On September 1, 2012, Derrick Hannah and his cousin, Christopher Graham, were shot while driving home from Kosciusko, Mississippi. Hannah testified that he and Graham rode in a TrailBlazer, with Graham as the driver and Hannah riding in the passenger seat. Hannah testified that a white car pulled beside the TrailBlazer, and the occupants of the white car started shooting into the TrailBlazer. Graham pulled the TrailBlazer to the side of the road, parked, and died moments later from gunshot wounds to his neck and chest. Hannah testified that when he tried to get out of the vehicle, he fell and lacked the ability to get up due to gunshot wounds to his side and stomach, which left him paralyzed from the chest down.

¶3. Police at the scene found a bag of what appeared to be marijuana in the lap of the deceased victim, Graham, and a "palm-size amount" of marijuana on the passenger-side floor near the door seal. Police recovered a .40 caliber Glock handgun and a spent shell casing by the driver's (Graham) seat console in the TrailBlazer, and police also discovered four 7.62

2

x 39 mm spent shell casings in the road within about 400 feet from the TrailBlazer. Police recovered no gun from which the 7.62 x 39 casings were allegedly fired. An Attala County grand jury later indicted and charged Fleming with one count of deliberate-design murder and one count of aggravated assault.

¶4. At trial, the surviving passenger of the Trailblazer, Hannah, testified that as the white car approached the Trailblazer on the road, the driver, Graham, said "they about to shoot us," and Hannah "looked right quick" and started ducking. Hannah testified that he possessed "no doubt" that Markeith Fleming was the shooter. Hannah testified that Fleming drove "like a white [Nissan] Altima." Hannah also testified that the gun used in the incident was a pistol. Hannah stated that he and Fleming went to school together, and that he had previously seen Fleming in that type of vehicle. Hannah stated that he knew of no reason why Fleming might want to shoot him or Graham, nor did he know of anyone else who might have reason to shoot them. Hannah claimed that shooting lasted for thirty or forty seconds, but admitted "that's a guess about how long the shooting lasted." When asked if more than one person was in the white car, Hannah responded: "It might have been, but I didn't see nobody else though."

¶5. Another witness, Fleming's cousin, Latanya Love, arrived at the scene to help Graham and Hannah. Love testified that about fifteen minutes before she arrived at the scene, a white car driving erratically approached her on the same road, and that she let the car pass and turned around to talk to a friend. Love identified the car as a Nissan Maxima, but stated that the car did not belong to Alesia Seals, Fleming's girlfriend.

3

¶6. Love further testified that an unidentified man flagged her down and directed her to Hannah and Graham when she resumed her travel down the road. Love walked over to Hannah and tended to him until medical personnel arrived. Love testified that she asked Hannah what happened, and he told her "them M.F.'s shot me." On direct examination, the State asked Love if Hannah told her who shot him, and Love responded, "he just said Maurice - - Markeith. He didn't say he shot me. He just said his name." Love testified that "everybody around that was coming on the scene kept saying that." On cross-examination, Love explained that Hannah gave no name to her but only told her that "them M.F.'s shot me," and she testified that she provided this information in her initial statement to police. She testified that police later went to her house after her initial statement, and told her to rewrite a statement. Love testified that she only told the police that others on the scene were saying "Markeith," but she testified that the police told her to write that Hannah identified Markeith Fleming as the shooter.

¶7. Officer Jimmy Nunn of the Attala County Sheriff's Department testified that he was dispatched to the scene, where Hannah told Officer Nunn that Fleming had shot him. Officer Randy Blakely, an investigator for the Attala County Sheriff's Department, testified that Fleming came to the police station later that evening, and Officer Blakely obtained a signed waiver-of-rights form and interrogated him. Fleming told Officer Blakely that he was at his girlfriend's house in Winona, Mississippi, during the incident. Fleming stated that he had been at his girlfriend's house since 10:00 p.m. the night before, and that he did not go to Attala County the day of the shooting.

¶8.    Officer Jimmie Dale Thomas of the Mississippi Highway Patrol testified that Fleming also told police that on September 1, 2012, he called his girlfriend, Seals, at 12:15 p.m. and told her that he was going to go get her car washed, and he did so at 1:00 p.m. at a Chevron station. Thomas also testified that Fleming said he spoke with Seals's sister after he washed the car, and they "came back to town." When Officers Blakely and Thomas finished interviewing Fleming, Officer Blakely asked for a number at which he could reach Fleming, and Fleming provided them a contact phone number. Officer Blakely then used the number to obtain phone records for that number from AT&T. Officer Thomas also took Fleming's fingerprints at the station.

¶9.    Forensic pathologist Erin Barnhart performed an autopsy on Graham. At trial, Dr. Barnhart testified that Graham suffered gunshot wounds to his nose, torso, chest, and left hand. Dr. Barnhart recovered two projectiles from Graham's body; one from his central chest area near the neck, and the other from his lung. Dr. Barnhart's internal examination revealed bleeding into the brain, multiple fractures to the rib cage, and lacerations to the left lung and trachea. Dr. Barnhart concluded that the cause of Graham's death was gunshot wounds, and the manner of his death was a homicide.

¶10.    Crime-scene analyst Khristopher Winger of the Mississippi Bureau of Investigation testified that he discovered numerous bullet holes ("defects") on the exterior and interior of the TrailBlazer, as well as projectile fragments and glass in the interior. Winger stated that he found glass and four 7.62 x 39 mm shell casings in the roadway near the TrailBlazer. Winger also discovered a "palm-size amount" of a "green, leafy substance" on the passenger

door seal area. Winger collected projectile fragments from the TrailBlazer's front passenger seat, back-passenger support post, and back driver-side door seal. He also collected the four shell casings from the road. Winger sent all of this to the Mississippi Crime Laboratory for testing.

¶11. Winger then went to Seals's house in Winona to analyze the white Nissan Altima for fingerprints and gunshot residue. He testified that he observed "a clean odor consistent with recent cleaning" in the Altima's interior. He also testified that the Altima contained personal items, drinks, electrical cords, clothing, and blankets. Inside the Altima's trunk, Winger found clothes, shoes, and a bucket containing a towel and a bottle of Palmolive. Winger swabbed the interior for gunshot residue and dusted the interior and exterior for fingerprints. He collected four gunshot-residue vials and twelve latent lift print cards from various locations inside and outside of the Altima, and he submitted all of this to the Mississippi Crime Laboratory for testing.

¶12. Chad Suggs of the Mississippi Crime Lab performed a gunshot-residue test on the four vials Winger collected from Seals's car. Suggs explained that of the four vials, one of them—from the back passenger seat—contained "a particle indicative of gunshot residue." Suggs explained, "[however, that] this indicative particle does not possess the combination of morphological characteristics and elemental composition necessary to identify it as gunshot residue to the exclusion of all other environmental particles." He testified that this particle "did not possess the shape nor the elemental composition to say that it is positive for gunshot residue." No particles of gunshot residue were found on the other three submissions.

6

¶13.    Forensic scientist Brian McIntyre was asked to analyze the four 7.62 x 39 mm shell casings that police recovered from the roadway to determine whether they were fired from the same gun. He testified that three of the cartridge cases were fired from one gun. The fourth cartridge case possessed characteristics consistent with the others, but McIntyre could not scientifically say that it was fired from the exact same gun.

¶14.    Forensic scientist Jamie Bush testified as an expert in latent fingerprint examination and comparison. Bush analyzed the twelve latent prints that Winger collected from the Altima and compared them to Fleming's prints collected by Officer Thomas after Fleming's interview. Bush testified that he found sixteen latent prints of value. He identified two of these prints as Fleming's—one his right middle finger, the other his right ring finger. Both prints were lifted from above the Altima's front passenger door. Bush testified that the remaining prints did not belong to Fleming, meaning "there was at least two people's" prints on the Altima. Bush agreed that it is possible for prints to remain present for two months. Bush also testified that the latent lifts did not contain any swipe marks, which, if present, would indicate "a recent swiping of liquid across the surface."

¶15.    As its final witness, the State called AT&T design engineer Thomas Gandy. Gandy testified that he was in charge of designing and optimizing AT&T's cell towers and "RF network" for Alabama, Mississippi, and the Florida panhandle. Through Gandy, the State introduced detail records of the mobile number that Fleming provided to police. Among other things, these records included call and text records, mobile numbers, times, and descriptions of calls, as well as AT&T's "location area code," which identifies a large

7

"general area" that the cell phone is in, the numbers indicating the sector and actual tower that the call came from, and the degrees of latitude and longitude for the site at which the call was made. Gandy testified that "this information tells us where the mobile [phone] is located in reference to the cell site," and it provides a "general idea of which direction the mobile [phone] is located." Gandy explained that when a call or text is placed, a signal travels to the tower with the strongest signal, not necessarily the closest tower. This provides "the general area" where the phone is located when a call or text is placed. Gandy acknowledged that numerous variables could affect which tower a phone connects with; for instance, if the nearest tower is overloaded, the call or text could be shifted to another tower. Gandy explained that in more rural areas, a phone may connect with a tower up to eight or ten miles away; and in more urban areas, phones usually connect to towers within two miles.

¶16. Using AT&T's records and his knowledge of AT&T's cell-tower network, Gandy testified that his analysis indicated that Fleming's cell phone started in Winona that morning, moved south through Possum Neck, Mississippi, and then into the Kosciusko area at about 10:00 a.m., where it remained until about noon, and then traveled back north to Winona.

¶17. At the conclusion of Gandy's testimony, the trial court made the following remarks for the record:

> I want to put this in the record.
>
> Mr. Gandy testified on behalf of AT&T. He was the subject of the motion for continuance. The records that he testified to were furnished to the defendant by the State in March. Obviously, somebody was going to have to testify to those records at that time.
>
> It was alleged on the motion for continuance that Mr. Gandy was an expert and

8

that the defense needed time to respond to an expert. Mr. Gandy was neither offered as an expert, nor did he give any expert opinion in this case. He merely testified to the records that the defendant had in March. And therefore, there is no expert testimony to respond to.

The State rested its case-in-chief at the conclusion of Gandy's testimony. Fleming exercised his right not to testify, and he called no witnesses. After deliberations, the jury returned a verdict finding Fleming guilty of both murder and aggravated assault. The trial court denied Fleming's motion for a JNOV or, in the alternative, a new trial. On appeal, Fleming argues that (1) the trial court erred in denying his motion for a continuance; (2) Fleming received ineffective assistance of counsel; and (3) the verdict was against the overwhelming weight of the evidence.

## STANDARD OF REVIEW

¶18. This Court's review of a trial court's actions regarding discovery issues is limited to an abuse-of-discretion standard. *Wyatt v. City of Pearl*, 876 So. 2d 281, 283 (¶6) (Miss. 2004) (citing *Byrom v. State*, 863 So. 2d 836, 849 (¶20) (Miss. 2003)). "The decision to grant or deny a motion for a continuance is within the sound discretion of the trial court and will not be reversed unless the decision results in manifest injustice." *Boone v. State*, 973 So. 2d 237, 241 (¶13) (Miss. 2008) (quoting *Ross v. State*, 954 So. 2d 968, 1007 (¶91) (Miss. 2007)). We also acknowledge that Uniform Rule of Circuit and County Court 9.04 provides guidelines for discovery in order to prevent unfair surprise or ambush by the other party. *See Ben v. State*, 95 So. 3d 1236 (¶36) (Miss. 2012); *Shaw v. State*, 139 So. 3d 79, 86 (¶24) (Miss. Ct. App. 2013). The Mississippi Supreme Court has addressed these guidelines, finding that a violation of Rule 9.04 is harmless error unless it affirmatively appears on the

9

face of the record that the violation caused a miscarriage of justice.

¶19. To prove ineffective assistance of counsel, a defendant must show that: (1) his counsel's performance was deficient, and (2) this deficiency prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The defendant bears the burden of proof to show both prongs. *McQuarter v. State*, 574 So. 2d 685, 687 (Miss. 1990). Under *Strickland*, a strong presumption exists that counsel's performance falls within the range of reasonable professional assistance. *Strickland,* 466 U.S. at 689. To overcome this presumption, "[t]he defendant must show that there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

¶20. When an appellant raises a claim of ineffective assistance of counsel on direct appeal, the claim should be addressed only when "(1) the record affirmatively show[s] ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge." *Colenburg v. State*, 735 So. 2d 1099, 1101 (¶5) (Miss. Ct. App. 1999). If this Court fails to reverse on other grounds and is unable to conclude that the defendant received ineffective assistance of counsel, we should affirm "without prejudice to the defendant's right to raise the ineffective assistance of counsel issue via appropriate post-conviction proceedings." *Id*.

¶21. "In reviewing a challenge to the weight of the evidence, this Court will overturn a verdict only when it is so contrary to the overwhelming weight of the evidence that to allow

it to stand would sanction an unconscionable injustice." *Graham v. State*, 120 So. 3d 382, 389 (¶26) (Miss. 2013) (citing *Bush v. State*, 895 So. 2d 836, 844 (Miss. 2005)). "The evidence is viewed in the light most favorable to the verdict." *Id*.

**DISCUSSION**

**I.      Motion for a Continuance**

¶22.   In February 2013, Fleming filed two motions for discovery requesting, among other things, the names and addresses of all witnesses, including expert witnesses, that the State proposed to offer at trial, as well as the contents and substance of any statement or opinion of each witness.  In March 2013, the State filed its first discovery response, which included a copy of extensive AT&T phone records relative to the cell phones at issue in this case, but the response identified no one from AT&T who would testify to these records at trial.

¶23.   On August 13, 2013, the State filed a supplemental discovery response identifying Michael Lynchard as custodian of records for AT&T.  The State's response disclosed that the State expected Lynchard to testify as the custodian of the phone records for AT&T. Three days later, the State filed a request for subpoenas that included Thomas Gandy, also an AT&T employee.  The State then filed a subpoena for Gandy on August 19, 2013.

¶24.   Then on August 28, 2013, approximately two weeks before trial, the State filed a second supplemental discovery response that designated Gandy for the first time as a witness for the State, and disclosed the following as the substance of his proposed testimony: "Thomas Gandy, AT&T Engineer—testify at trial regarding AT&T cell towers and cell tower locations.  Also testify to calls and text messages made to and from telephone number

11

[****] on September 1, 2012, including cell towers utilized by said numbered phone on said date." The State also provided an attached map of cell towers and diagram of calls and towers, as well as Gandy's curriculum vitae.

¶25. On September 13, 2013, Fleming filed a motion for a continuance requesting time to retain an expert to review the AT&T records and determine if a valid rebuttal to Gandy's testimony existed. The trial court heard the motion on September 16, 2013, the day of the trial, and the trial court denied Fleming's motion for a continuance. The trial court explained that the State had complied with discovery and provided the defense with the AT&T records in its first discovery response six months prior to the trial, and that Fleming's counsel "had to know that somebody was going to testify to it."

¶26. Fleming argues that he presented sufficient good cause under the circumstances to warrant a reasonable continuance in order to afford his trial counsel an adequate opportunity to make beneficial use of the State's belated disclosure of Gandy as an expert witness, and to prepare an adequate defense or rebuttal to Gandy's testimony. The record reflects that the trial judge found that the defense received the cell-phone records six months prior to trial, and the record shows the State supplemented discovery twice prior to trial as to the witnesses for these records.

¶27. The State maintains that although Gandy could have been qualified as an expert witness, the State did not tender Gandy as an expert at trial.[1] The State argues that Gandy,

---

[1] At trial, the trial judge stated on the record:

It was alleged on the motion for continuance that Mr. Gandy was an expert and that the defense needed time to respond to an expert. Mr. Gandy was

12

as a representative of AT&T, simply testified as to what he personally observed after viewing Fleming's telephone records, and then Gandy used the latitude and longitude points that were identified in the phone records to place each call and text to a location on a map. The State asserts that Gandy never offered an expert opinion based upon a hypothetical question or otherwise.[2]

¶28.   Uniform Rule Circuit and County Court 9.04(G) provides:

> Upon a showing of cause, the court may at any time order that specified disclosures be restricted or deferred, or make such other order as is appropriate, provided that all material and information to which a party is entitled must be disclosed in time to permit the party's attorney to make beneficial use thereof.

The supreme court has held that the "decision to grant or deny a motion for a continuance is within the sound discretion of the trial court and will not be reversed unless the decision results in manifest injustice." *Boone*, 973 So. 2d at 241 (¶13) (citing *Ross*, 954 So. 2d at 1007 (¶91)).

¶29.   While cognizant of our above-stated standard of review, we also acknowledge that the record before us shows that the cell-phone records were admitted without objection, and Fleming filed no pretrial motion to suppress the disclosed AT&T phone records. The cell-phone records included the following: the date, the connection time, the seizure time, the originating number, the terminating number, the elapsed time of the call, the mobile serial

---

neither offered as an expert, nor did he give any expert opinion in this case. He merely testified to the records that the defendant had in March.

[2] *Compare* M.R.E. 702 (testimony by experts) and M.R.E. 701 (opinion testimony by lay witnesses).

number, the number assigned to the phone from AT&T's switching system, and the description of the type of call (mobile, land line, etc.). The phone records also contained a list of call item numbers and times; the tower names that the phone company assigned; and a call map showing the location, latitude, and longitude of each of AT&T's towers relative to calls and texts made and received. The transcript shows Gandy provided testimony to explain the information in these cell-phone records previously disclosed by the State to the defense six months prior to the trial. We acknowledge that the record reflects that the defense received notice of Gandy as a potential witness for the State approximately two weeks before trial.

¶30.    Uniform Rule Circuit and County Court 9.04 addresses disclosure of witnesses prior to trial. Mississippi Rule of Evidence 701, which governs testimony by lay witnesses, states:

> If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to the clear understanding of the testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702 [of the Mississippi Rules of Evidence].

¶31.    In the recent case of *Collins v. State*, 2013-KA-00761-COA, 2014 WL 4977498, at *10 (¶42) (Miss. Ct. App. Oct. 7, 2014), this Court found no error where a lay witness testified at trial regarding cell-phone records in evidence. The *Collins* court observed that the witness provided no expert testimony based on scientific, technical, or other specialized knowledge within the scope of Rule 702. *Collins*, 2014 WL 4977498, at *10 (¶42). The witness in *Collins* used the cell-phone records to plot the latitude and longitude coordinates of cell phone communications set forth in those records and to plot the geographic location

14

of the cell phones identified in these records at the time each communication was made. *Id.* at *9 (¶38). Similar to this case, the witness also testified that the resulting map indicated that the two cell phones at issue therein moved geographically closer to each other as the night progressed. *Id.* The *Collins* court opined:

> A reasonably competent layperson, given a small amount of information, could easily examine a cell-phone record and determine the identity of the cell tower that handled a particular call. That same layperson, given a map of cell towers in the area, could identify the approximate location of the cell phone at the time the call was made or received.

*Id.* at *10 (¶42) (citing *Russ v. Safeco Ins. Co. of Am.*, No. 2:11CV195-KS-MTP, 2013 WL 1310501, at *29 (S.D. Miss. Mar. 26, 2013) (district court discussed whether certain testimony about cell-phone records constituted lay testimony or expert testimony)).

¶32. Uniform Rule of Circuit and County Court 9.04(A)(1) "requires the prosecution to disclose the names and addresses of all witnesses in chief, and any recorded statements made by the defendant and/or witness, proposed to be offered by the prosecution at trial." *Shaw v. State*, 139 So. 3d 79, 86 (¶24) (Miss. Ct. App. 2013) (citing *Harris v. State*, 37 So. 3d 1237, 1241 (¶17) (Miss. Ct. App. 2010)). "The guidelines from Rule 9.04 were intended to prevent 'ambush' or unfair surprise at trial by either party." *Shaw*, 139 So. 3d at 86 (¶24). The record reflects no abuse of discretion by the trial court herein in its finding of no unfair surprise or ambush by the State, since the phone records, containing the information constituting the substance of Gandy's testimony at trial, were provided to the defense six months before the trial. *See Murray v. State*, 20 So. 3d 739, 743 (¶12) (Miss. Ct. App. 2009) (finding that the State provided sufficient notice of a testifying witness where the substance

of the witness's testimony had been provided to the defense).

¶33. After our review, we find no abuse of discretion in the trial court's admission of Gandy's testimony into evidence at trial. *See id.*; M.R.E. 702. We also find that the defense received the cell-phone records six months prior to the trial date, and received notice of Gandy as a State witness approximately two weeks prior to trial. Accordingly, we find no abuse of discretion in the trial court's denial of Fleming's request for a continuance. *See Wyatt*, 876 So. 2d at 283 (¶6).

## II.    Ineffective Assistance of Counsel

¶34. Fleming next claims that he received ineffective assistance of counsel. Specifically, Fleming argues that his trial counsel performed deficiently when he allowed the State to present expert testimony through Gandy without tendering him as an expert, and that as a result, Fleming's trial was prejudiced.

¶35. Fleming states that Gandy based his testimony that the phone at issue traveled from Winona to Kosciusko, and then back, on the day of the incident on specialized knowledge of cellular-tower-network function and operation, as well as Gandy's engineering expertise and experience in the field, which exceeds far beyond that of an "average, randomly selected adult." Fleming argues that his trial counsel erred in allowing the State to elicit expert testimony from Gandy without first tendering him as an expert witness. Fleming asserts that Gandy's testimony constituted the sole trial evidence placing him at the scene of the shooting. Fleming argues that without Gandy's testimony, a reasonable probability existed that the jury would have weighed the evidence differently and reached a different result.

16

¶36.   The State asserts that Gandy only testified as to what he personally observed after viewing Fleming's phone records. In providing statements as to what the records contained, Gandy provided no opinion evidence or expert testimony. As a result, the State did not tender him as an expert.

¶37.   The State further argues that Fleming failed to demonstrate that he needed an expert to meet the evidence presented by Gandy. The State also claims that Fleming never argued that the AT&T records were inaccurate, nor did he argue that expert testimony was required to use the latitude and longitude points identified in the phone records to plot a location on a map.

¶38.   To prove ineffective assistance of counsel, Gandy must show that: (1) his counsel's performance was deficient, and (2) this deficiency prejudiced his defense. *Strickland*, 466 U.S. at 687. A strong presumption exists that counsel's performance falls within the range of reasonable professional assistance. *Id*. at 689. To overcome this presumption, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. As stated, when a claim of ineffective assistance of counsel is raised on direct appeal, as in the case before us, the claim should be addressed only when "(1) the record affirmatively show[s] ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge." *Colenburg*, 735 So. 2d at 1101 (¶5). If this Court fails to reverse on other grounds and is unable to conclude that the defendant received ineffective

17

assistance of counsel, we should affirm "without prejudice to the defendant's right to raise the ineffective assistance of counsel issue via appropriate post-conviction proceedings." *Id*. We recognize that review on direct appeal of an ineffective-assistance-of-counsel claim is confined strictly to the record. *Id*. at 1102 (¶6).

¶39.    In this case, the face of the record fails to reflect any merit to Fleming's claim of ineffective assistance of counsel. The record reflects no abuse of discretion by the trial court in the admission of Gandy's testimony into evidence at trial. Gandy's testimony was rationally based upon the information set forth in the disclosed phone records. The trial court admitted the phone records into evidence at trial without objection, and Gandy's testimony provided a helpful and clear understanding of the records. *See Collins*, 2014 WL 4977498, at *10 (¶42); M.R.E. 701. Upon review of the record, Fleming therefore failed to establish any deficiency of performance by his counsel at trial. *See Colenburg*, 735 So. 2d at 1101 (¶5). Therefore, in this direct appeal, we find this assignment of error lacks merit without prejudice to Fleming's right to raise this issue of ineffective assistance of counsel in appropriate post-conviction-relief proceedings.

### III.    Weight of the Evidence

¶40.    Fleming argues that the trial court's refusal to grant him a continuance to prepare for Gandy's testimony, as well as the improper admission of Gandy's testimony since the State failed to tender him as a witness, resulted in a manifest miscarriage of justice. Fleming asserts that beyond Gandy's testimony, the State's remaining evidence against Fleming "was weak and self-conflicting." Fleming states that although Hannah claimed to see Fleming

18

point a gun from the white car, Hannah also admitted that he only "looked right quick" and started ducking before shots were fired.

¶41. In *Graham v. State,* 120 So. 3d 382, 389 (¶26) (Miss. 2013), the supreme court stated the standard for reviewing a challenge to the weight of the evidence, explaining:

> [T]his Court will overturn a verdict only "when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Bush*, 895 So. 2d at 844. The evidence is viewed in the light most favorable to the verdict. *Id*. If the verdict is against the overwhelming weight of the evidence, the proper remedy is to grant a new trial, but this remedy should be used only in exceptional cases where the evidence "preponderates heavily against the verdict." *Id*.

¶42. A review of the record herein reflects overwhelming evidence supporting the verdict of the jury. Further, our review reveals no unconscionable injustice that would result from allowing the verdict to stand. In summary, the trial transcript contains eyewitness testimony by Hannah, stating that he saw Fleming driving a white Altima and pointing a gun at the Trailblazer seconds before shots were fired. Hannah testified that he observed no other person in the white car with Fleming. The record also reflects that Fleming's girlfriend drove a white Altima. Cell phone records presented at trial placed Fleming in the same area as the murder, shortly before the murder occurred. Accordingly, this assignment of error is without merit.

¶43. **THE JUDGMENT OF THE ATTALA COUNTY CIRCUIT COURT OF CONVICTION OF COUNT I, MURDER, AND SENTENCE OF LIFE, AND COUNT II, AGGRAVATED ASSAULT, AND SENTENCE OF TWENTY YEARS, WITH THE SENTENCES TO RUN CONSECUTIVELY IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO ATTALA COUNTY.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, MAXWELL AND**

**JAMES, JJ., CONCUR. ROBERTS AND FAIR, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**