# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-KA-00684-SCT

*CAROLYN MARIE BARNES*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/11/2008 |
| TRIAL JUDGE: | HON. FRANK G. VOLLOR |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF INDIGENT APPEALS |
| | BY: ERIN ELIZABETH PRIDGEN |
| | TONI DEMETRESSE TERRETT |
| | LESLIE S. LEE |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DEIRDRE McCRORY |
| DISTRICT ATTORNEY: | RICHARD EARL SMITH, JR. |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 03/04/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRAVES, P.J., LAMAR AND KITCHENS, JJ.**

**GRAVES, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     Carolyn Barnes was convicted of one count of embezzlement in the Circuit Court of Warren County and sentenced to ten years in the custody of the Mississippi Department of Corrections.  Barnes' post-trial motion was denied and she filed this appeal.  We find that the issues raised by Barnes are without merit and that her conviction should be affirmed.

**FACTS**

¶2.    Carolyn Barnes was a home caregiver for Lottie Montague's husband.  Upon his death, the family continued to employ Barnes to assist 86-year-old Lottie Montague with daily activities.  Barnes had a key to Montague's home, kept Montague's vehicle for personal use and to take Montague on errands, and was paid an hourly wage.  On May 8, 2006, Barnes drove Montague to a senior citizens center in Vicksburg.  After leaving the center, Barnes drove Montague to BancorpSouth, where Montague cashed a check for $3,000 with the intention of depositing the money into the credit union account of Montague's daughter, Joyce.  The pair picked up lunch and proceeded to Mutual Credit Union, where Barnes offered to take the money inside and deposit it in Joyce's account because she said she knew the teller.  Barnes took the money and entered the credit union.  When Barnes exited the credit union, Montague's son, Charles, came walking up.  Charles, who worked across the street from the credit union, asked what Montague and Barnes were doing there and Barnes indicated she would tell him later.

¶3.    The pair returned to Montague's house and ate lunch.  Montague then told Barnes she was going to take a nap and that Barnes could leave for the day.  Barnes said she would lock the door and then left.  Shortly thereafter, Montague was awakened by someone straddling her and holding a pillow over face and rubbing it back and forth.  Montague testified that she initially struggled, but then she thought she was going to die and just relaxed.  The attacker removed the gold and diamond ring from Montague's fingers, took her leather wallet containing $300 and her credit cards, and her keys.  Montague was unable to identify her attacker, but was able to tell that the person was tall, thin and wearing a white shirt with a blue stripe.  Montague called 911. Law enforcement and emergency medical personnel

2

arrived on the scene. Montague provided details of the attack and was later transported to the emergency room. Barnes returned to Montague's house and spoke with investigators from the Warren County Sheriff's office, including Todd Dykes and Randy Lewis. Investigators found no signs of forced entry. Barnes never returned to work for Montague. However, Barnes kept in contact with investigators, wanting to know how the case was progressing.

¶4. On May 9, 2006, the day following the attack, Barnes called Dykes. Barnes told Dykes that, although the initial report made by Montague was that $300 was taken, an additional $3,000 actually had been taken. However, Barnes failed on at least two separate occasions to mention anything about going to Mutual Credit Union to deposit the money. Dykes relayed the information provided by Barnes to Lewis, who was working the case. After Barnes told investigators that an additional $3,000 had been taken, investigators talked with Montague, and she told them that Barnes was supposed to have deposited the money into Joyce's account. However, the money was never deposited. Further, investigators obtained surveillance photographs, taken from surveillance video[1] from Mutual Credit Union, that showed Barnes, wearing a white shirt with a blue stripe, enter the bank, go toward the deposit counter and do nothing. Barnes was wearing a different shirt when she returned to Montague's home following the attack.

¶5. Investigators asked Barnes to go to the sheriff's office on May 23, 2006, for an interview. During the course of the interview and based on discrepancies in her version of

_____

[1]A bank employee also testified regarding the video.

3

the events, Barnes was read her *Miranda*[2] rights and was later arrested. On May 24, 2006, authorities executed a search warrant on Barnes' home, but did not find any of the items taken from Montague or the white shirt with a blue stripe that Barnes was wearing on the surveillance video.

¶6. Barnes was indicted on charges of embezzlement and robbery. Barnes was convicted only of embezzlement and sentenced to serve ten years in the custody of the Mississippi Department of Corrections. Subsequently, Barnes filed this appeal.

**ANALYSIS**

**I. Whether the trial court misapplied the law in admitting Barnes' statements made during custodial interrogation, thus depriving Barnes of her constitutional Right to Counsel.**

¶7. Barnes asserts that the trial court should have suppressed her statements because they were taken in violation of her constitutional Right to Counsel. Barnes asserts that she attempted to invoke her Fifth Amendment Right to Counsel during her interview with authorities on May 23, 2006. Barnes further asserts that her statement to police was taken in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution and Section 26 of Article 3 of the Mississippi Constitution.

¶8. This Court will reverse a trial court's denial of a motion to suppress only if the ruling is manifest error or contrary to the overwhelming weight of the evidence. *Ruffin v. State*, 992 So. 2d 1165, 1169 (Miss. 2008) (citations omitted). Under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), custodial interrogation must be preceded

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

4

by advising the defendant of his right to remain silent and his right to an attorney. *Id*. at 479. Upon invocation of the right to remain silent, the interrogation must cease. *Id*. If the defendant invokes his right to counsel, the interrogation must cease until an attorney is present. *Id*. "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Id*. at 475. Once a defendant asks for counsel, he cannot be interrogated further until counsel has been made available, "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981).

¶9.    However, the "applicability of the '"rigid" prophylactic rule' of *Edwards* requires courts to first 'determine whether the accused *actually invoked* his right to counsel.'" *Davis v. U.S.*, 512 U.S. 452, 458, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994) (citations omitted). Determining whether a defendant actually invoked his right to counsel is an objective inquiry. *Id*. at 459. A defendant "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect. *Davis*, 512 U.S. at 459. Further, the U.S. Supreme Court in *Davis* reiterated that there is no requirement that police clarify whether or not a defendant actually wants an attorney when the defendant makes an ambiguous or equivocal statement. *Davis*, 512 U.S. at 461. The Court said that, although clarifying questions are good police practice, "we decline to adopt

a rule requiring officers to ask clarifying questions. If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Id*. at 461-62.

> To recapitulate: We held in *Miranda* that a suspect is entitled to the assistance of counsel during custodial interrogation even though the Constitution does not provide for such assistance. We held in *Edwards* that if the suspect invokes the right to counsel at any time, the police must immediately cease questioning him until an attorney is present. But we are unwilling to create a third layer of prophylaxis to prevent police questioning when the suspect *might* want a lawyer. Unless the suspect actually requests an attorney, questioning may continue.

*Davis*, 512 U.S. at 462. *See also* *Delashmit v. State*, 991 So. 2d 1215, 1221 (Miss. 2008); and *Chamberlin v. State*, 989 So. 2d 320, 333 (Miss. 2008).

¶10.   During the hearing on the motion to suppress, Lewis testified that Barnes was not a suspect when he called her and asked her to come to his office for a noncustodial interview. Barnes' interview was videotaped and later transcribed. However, Lewis testified that during the course of the interview, Barnes made some contradictory statements, which are discussed further herein, that made her a person of interest. At that point, Lewis said Barnes was given her *Miranda* rights and a waiver. Lewis further testified that Barnes still was not a suspect at that point, but that he was aware that she had made contradictory statements. Lewis also testified that Barnes never asserted her right to have an attorney present, but that she was offered an attorney.

¶11.   In the motion to suppress her statement, Barnes argued that she had asserted her right to counsel multiple times. The trial court denied Barnes' motion, finding that Barnes understood her right to get an attorney, that Barnes never asked for an attorney, and that her

statements were free and voluntary. The trial court also noted that Barnes never made any inculpatory statements.

¶12.    Barnes argues on appeal that the first assertion after she was given the *Miranda* warning was when she made the statement, "So, I don't need legal, okay . . . ." However, this is not an assertion of her right to counsel, but rather an attempt to clarify whether she must have an attorney present. Barnes testified during the hearing on the motion to suppress that she made the statement "[t]o see did I need to have a lawyer there, did I need some legal representation . . . ." Further, after Barnes made this statement, Lewis explained to her that he had to advise her of her rights and make sure she understood before he asked her any more questions. Barnes indicated that she understood.

¶13.    Barnes next claims that she again asserted her right to counsel when she said, "But I don't have an attorney here." However, again, this statement read in the context in which it was made does not indicate an explicit request for an attorney. Barnes continued talking. Lewis interrupted her on two separate occasions and advised her to "hold on just a second" until he had the information written on the waiver so she could read over it. Lewis then reviewed the waiver with Barnes. Barnes indicated that she understood. Further, Barnes again testified during the hearing on the motion to suppress that this statement was merely a question as to whether she needed to have an attorney present.

¶14.    Barnes claims that the "clearest example" that she had asserted her right to counsel was when she said, "Now if I do need to get a lawyer . . . I will get one." However, Lewis asked whether that was what she wanted to do and she replied, "It don't matter to me." Lewis again asked whether she wanted to, and she replied, "Whatever I've got to do, but I'm

7

not fixing to get railroad [sic] up in this mess because Joyce is the one that gets . . . getting all . . . getting her and her husband since she bought him from Iraq, she's the one that's talking about she's been broke since she got 'Farkad' [Joyce's husband] over here." Barnes testified at the hearing on the motion to suppress that this statement meant exactly what it says, "[m]eaning if I needed to get a lawyer, that I would get one, whatever I have to do."

¶15. We find that the record supports a finding that Barnes received the *Miranda* warning, that she knowingly and intelligently waived the rights, and that she freely and voluntarily made the statements. Pursuant to *Davis*, Barnes failed to make an unambiguous, unequivocal request for an attorney, and Lewis had no obligation to stop questioning her. *Id*. at 461-62. *See also Chamberlin*, 989 So. 2d at 333. Therefore, this issue is without merit.

**II. The trial court erred in denying Barnes' motion for a new trial as the verdict was against the overwhelming weight of the evidence.**

¶16. Barnes was indicted for embezzling the $3,000 under Mississippi Code Section 99-23-19, which provides, in relevant part:

> If any director, agent, clerk, servant, or officer of any incorporated company, or if any trustee or factor, carrier or bailee, or any clerk, agent or servant of any private person, shall embezzle or fraudulently secrete, conceal, or convert to his own use, or make way with, or secrete with intent to embezzle or convert to his own use, any goods, rights in action, money, or other valuable security, effects, or property of any kind or description which shall have come or been intrusted to his care or possession by virtue of his office, place, or employment, either in mass or otherwise, with a value of Five Hundred Dollars ($500.00) or more, he shall be guilty of felony embezzlement, and, upon conviction thereof, shall be imprisoned in the Penitentiary not more than ten (10) years, or fined not more than Ten Thousand Dollars ($10,000.00), or both.

Miss. Code Ann. § 97-23-19 (Rev. 2003).

8

¶17. This Court reviews a trial court's denial of a motion for new trial under an abuse-of-discretion standard. *Dilworth v. State*, 909 So. 2d 731, 737 (Miss. 2005). "A greater quantum of evidence favoring the [S]tate is necessary for the [S]tate to withstand a motion for a new trial, as distinguished from a motion for J.N.O.V." *Id*. (quoting *Pharr v. State*, 465 So. 2d 294, 302 (Miss. 1984)). "Accordingly, we defer to the discretion of the trial judge, and '[w]e will not order a new trial unless convinced that the verdict is so contrary to the overwhelming weight of the evidence that, to allow it to stand, would be to sanction an unconscionable injustice.'" *McClendon v. State*, 945 So. 2d 372, 385 (Miss. 2007) (quoting *Groseclose v. State*, 440 So. 2d 297, 300 (Miss. 1983)). This Court further has said:

> However, the evidence should be weighed in the light most favorable to the verdict. A reversal on the grounds that the verdict was against the overwhelming weight of the evidence, unlike a reversal based on insufficient evidence, does not mean that acquittal was the only proper verdict. Rather, as the "thirteenth juror," the court simply disagrees with the jury's resolution of the conflicting testimony. This difference of opinion does not signify acquittal any more than a disagreement among the jurors themselves. Instead, the proper remedy is to grant a new trial.

*Dilworth*, 909 So. 2d at 737.

¶18. Barnes asserts that the verdict was not supported by the overwhelming weight of the evidence because too much weight was placed on Montague's testimony. Barnes also asserts that Montague's testimony was "riddled with inconsistencies and contradictions." Barnes' claim is an exaggeration not supported by the record in this matter.

¶19. Barnes asserts that statements about whether she returned to the home after the attack and whether Montague had an additional set of house keys were contradictory. However, it is rational to assume that since Montague had just been attacked, was treated at the scene

9

and then taken to the hospital, she may not have realized whether Barnes returned to the scene. Further, various parts of the record are contradictory as to which keys were even taken. More importantly though, neither of these statements has anything to do with the embezzlement.

¶20. Barnes further asserts that "Montague's most damaging contradiction occurred when she acknowledged Carolyn's conversation with Charles, her son, outside the Mutual Credit Union." Barnes asserts that because Montague admitted that Charles asked what the pair was doing at the credit union and Barnes responded she would tell him later, that it somehow proves that Montague was hiding something from Charles. However, this argument is nonsensical. There is no contradiction in the record regarding what was said by and to Charles at the credit union. The only contradictions regarding the credit union are Barnes' various versions of what occurred there. Barnes failed to mention anything about the credit union to investigators. When Lewis specifically asked Barnes during the interview whether the pair stopped at the credit union, Barnes indicated that the pair stopped at the bank so Montague could withdraw money. Further, Barnes said the pair then proceeded to the credit union because Montague wanted to withdraw more money, but that they saw Charles and Montague changed her mind.[3] Barnes then indicated that, upon changing her mind, Montague told Barnes to go in and get some change. However, this scenario was contradicted by both Barnes herself and other evidence in the record. Barnes testified at trial that, after they left the bank and as they were driving, Montague indicated she needed some change, so Barnes stopped at the credit union. The surveillance video indicated that Barnes

---

[3]At this point, Lewis advised Barnes of her rights.

did nothing, and did not even get change, upon entering the credit union. Further, the video, Montague, and Barnes' statement established that Charles was not there before Barnes went into the credit union, but came up as Barnes exited. The evidence presented at trial established that Barnes was employed by Montague. The evidence also established that Montague entrusted Barnes with $3,000 to deposit into Joyce's account. Further, Barnes failed to deposit the money, but instead secreted it for her own use.

¶21. Barnes has failed to establish that the trial court abused its discretion in denying the motion for new trial. Further, Barnes has failed to establish that the verdict is contrary to the overwhelming weight of the evidence. Therefore, this issue is without merit.

## CONCLUSION

¶22. For the reasons stated herein, we affirm the judgment of conviction of embezzlement in the Circuit Court of Warren County and sentence of ten years in the custody of the Mississippi Department of Corrections.

¶23. **CONVICTION OF EMBEZZLEMENT AND SENTENCE OF TEN (10) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

**WALLER, C.J., CARLSON, P.J., DICKINSON, RANDOLPH, LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR.**

11