# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-KA-01683-SCT

*ZACHARY D. BARNES a/k/a ZACHARY BARNES*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/12/2013 |
| TRIAL JUDGE: | HON. ROBERT B. HELFRICH |
| TRIAL COURT ATTORNEYS: | ELIZABETH PORTER |
| | KATHLEEN CHMELICEK |
| | DECARLO HOOD |
| | ZACH VAUGHN |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF THE STATE PUBLIC DEFENDER |
| | BY: ERIN E. PRIDGEN |
| | GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BARBARA BYRD |
| DISTRICT ATTORNEY: | PATRICIA A. THOMAS BURCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 02/19/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE DICKINSON, P.J., LAMAR AND CHANDLER, JJ.**

**LAMAR, JUSTICE, FOR THE COURT:**

¶1. Zachary Barnes was convicted of burglary of a dwelling and sentenced to twenty-five years in prison, with twenty years to serve and five years' post-release supervision. He appeals to this Court, arguing that his statement to the fire investigator should have been

suppressed and that his trespass instruction should have been granted. We find that the trial judge should have granted his trespass instruction, and we reverse and remand for a new trial.

## FACTS AND PROCEDURAL HISTORY

*Investigation and Indictment*

¶2.     On May 3, 2012, Michael Scott's apartment was broken into and burned. After speaking with other residents of the apartment complex, Fire Investigator Chip Brown spoke with fifteen-year-old Charles Darby and Darby's mother's boyfriend, Zachary Barnes. Darby and Barnes lived in a trailer across the road from Scott's apartment. Brown spoke extensively with Darby the night of the fire, and Darby named Barnes as the perpetrator. Barnes was arrested the next day and charged with arson, and the judge set his bond at $40,000.

¶3.     Brown subsequently spoke with Barnes at the jail on two occasions. During the first interview, Barnes denied involvement in the crime. Barnes stated that he had had an altercation with a neighbor the night of the crime and was stabbed. Barnes went back home where his girlfriend, Rebecca Henson (Darby's mother), tried to stop the bleeding. Darby came in and said "Don't worry about that; you know, I handled that."

¶4.     Barnes's story changed during the second interview. Darby and Henson were present during the second interview, and Barnes said he changed his story because Brown promised he would get Barnes's bond reduced. Brown denies that he promised Barnes anything.[1] Ultimately, Barnes wrote a statement during the second interview implicating himself:

[1]The trial judge granted a bond reduction about two weeks after Barnes's second statement, reducing Barnes's bond from $40,000 to $12,000. At the suppression hearing, Barnes's counsel stated that their office had nothing to do with getting his bond reduced.

2

I was with Charles when he set the fire. We went to the house in [sic] threw some thing[s] around. Then he said he was about to set the house on fire. Then we left and when I got to the house I was bleeding from the fight early [sic]. We left at the same time after. I saw him set the bed on fire. When we got home I was trying to stop the bleeding from the stab wound he call [sic] me to the kitchen window and I saw the house on fire.

Barnes subsequently was indicted for arson and for directing a minor (Darby) to commit a felony.

¶5.     But a few months later, Darby changed his story. Darby told the authorities that he had lied in his earlier statement when he said that Barnes had started the fire.[2] Darby stated at trial that "at first I was trying to get him [Barnes] locked up because I didn't want to go to jail for doing it, and he [Barnes] told me to man up about it and do the time so I just admitted to it, and I went to court." The State presented an Order of Nolle Prosequi to the court on Barnes's indictment following Darby's recantation.

¶6.     But two days before Barnes's first indictment was *nolle prossed*, a grand jury indicted him a second time, this time for burglary of a dwelling. The trial judge set Barnes's bond at $10,000 for the burglary charge.

*Pretrial Proceedings*

¶7.     A couple of weeks before trial, Barnes's counsel filed a motion in limine, arguing that Barnes's statement implicating himself should be suppressed because Barnes had requested an attorney, and because Brown had promised him a bond reduction. The State responded to Barnes's motion, and the trial judge held a hearing on the motion the day before trial.

_____

[2]According to an email from the district attorney to Barnes's counsel, the State spoke with Darby while he was being held at a juvenile facility in Meridian.

3

¶8.     Both Barnes and Brown testified at the hearing.  Barnes testified that Brown spoke

with him on three occasions.  On the first occasion, Barnes told Brown that he wanted to

"invoke my [right] to remain silent because I was scared that I might incriminate myself or

something."  On the second occasion, Barnes wrote a statement:

> and told him [Brown] that we had a – I had an altercation with a neighbor in
> which I got stabbed, and I went back home and my girlfriend, fiancé, was
> trying to stop me from bleeding and everything, and that's when – when we
> was in the house, Charles Darby came back.  He came to the house, and he was
> like, Don't worry about that; you know, I handled that.  So I was like, What
> are you talking about?  And he was like he handled that.

And finally, as for the third occasion (when Barnes gave the statement implicating himself),

Barnes testified that:

> A.  Yes, he [Brown] brought Charles Darby and my fiancé.  He brought them
> both down with him.  He said that he had already spoke [sic] to my fiancé
> about the bond and how much she could afford to pay to get me bonded out of
> jail.  And my bond at first was $50,000,[3] and I couldn't afford 50, so he told
> me that – cause I had been there three months, and he was like, Well, you ain't
> going to get no preliminary hearing until you tell me, you know, what I want
> to hear.  And if you tell me – write this statement down, and you and Charles
> Darby are going to tell you [sic] exactly what to say on this statement, and you
> write it down.  Then I can guarantee you that I'll get your bond reduced, so I
> wrote the statement down, and the next week I came over here still never
> seeing the lawyer or anything and got my bond reduced.
> . . .
> Q. So to you admitting to a crime you didn't commit – let me rephrase it.  To
> you getting out of jail temporarily meant more than telling the truth; you were
> willing to sign anything just to get out of jail for just a minute; is that what
> you're saying?  You admitted to a crime; didn't you?
>
> A.  No, sir.  What I did was when he told me that he could get me a bond
> reduction because I had been locked up three months, and I've got a family
> that I'm the sole provider for.  And he told me that in a prior case, that he got

_____

³We note that this amount is incorrect.  According to the order following Barnes's
initial appearance, his bond initially was set at $40,000.

somebody three years probation, and he could get my bond reduced from $50,000 to a lower bond, and that's exactly what he did.

. . .

Q. But you wrote that, and you say that this is false; everything you wrote here is false; is that what you're saying?

A. Yes.

Q. Okay. That's all false, and you did that just so you could get out of jail, correct?

A. Yes.

Barnes also testified that he had asked for an attorney on the third occasion, while Darby and Henson were present. But Barnes also admitted that he had initialed a ***Miranda*** [4] form during both interviews. He admitted that the form advised him that he had the right to an attorney, and that he had signed off on a provision that stated that he did not want an attorney at that time.

¶9.     Brown then testified and denied promising Barnes a bond reduction:

Q. I also wanted to ask you at any point in time did you play a role in the setting of the bond for Mr. Barnes?

A. No. I'm not in any position to set a bond.

Q. Did you have an input on the original bonds?

A. No.

. . .

Q. Do you have any idea how that happened?

A. How the bond was reduced?

Q. Yes, sir.

A. I was – I don't believe I was at either one of those bond hearings. I do know that during the – I was approached several times by Ms. Henson – I believe at the time it was Mr. Barnes' [s] fiancé – asking how they could get the bond reduced. I said, I don't have anything to do with reducing the bond. All I can do is when I turn in my case, I can tell the D.A. that Mr. Barnes was very cooperative, but I can make no promises because that's strictly up to the courts.

. . .

_____

[4] ***Miranda v. Arizona***, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Q. Did you promise [Barnes] anything to either change his statement or make a statement?
A. No, sir.
. . .
Q. Would you get in trouble if you had promised Barnes a bond reduction?
A. I would probably be reprimanded, yes.
Q. And you're aware of that?
A. Yes. That's why I would never do it.

¶10. Brown also testified that Barnes "never asked for an attorney." When Barnes made statements like "maybe I should get an attorney," Brown testified that he referred Barnes back to the *Miranda* form that he had signed and told Barnes that he had "every right" to have an attorney, and that they could stop the questioning at any time and wait for an attorney.

¶11. After hearing Barnes's and Brown's testimony and argument from counsel, the trial judge denied Barnes's motion to suppress. He did not elaborate on his reason for doing so, but he did state that there was "no proof that the State was involved in [the bond reduction]."

*Trial*

¶12. The State presented three witnesses at trial: Charles Darby, Scott's neighbor Josett Busha, and Brown. Darby's testimony is sometimes difficult to follow, so we recite the pertinent portions verbatim:

Q. Can you tell the jury what happened around ten o'clock that night in the apartment of a Michael Scott?
A. An altercation happened and my step – then Zachary Barnes and me got mad. I went up to the apartment. I said, Let's burn it. And he – and then I set the fire, and he said, Come on; let's go. And I left out and went to the trailer that we lived in.
Q. Okay. Let's break things down one by one. Okay. Now, did you go into the house or the apartment.

6

A. O, yeah, I forget. First we destroyed the apartment. Then we went back up there and burnt it up. I went back there and burnt it up.

. . .

Q. Now, did you have permission to go in there or anything like that? On this particular date, did you have permission to go in there?

A. No, sir.

Q. Okay. And what happened in there? What did – what did you do, and what did Mr. Barnes do while y'all were in there?

A. Well, the first time we went in there, we just flipped over all the stuff, and we went back downstairs. And another altercation had happened, and then when we went back up. I said, Let's burn it up, and we went back up again, and I set the – you know – mattress afire, and then I set the furniture on fire . . . And then we ran out.

Q. So you went in there two times then on this same day?

A. Yes, sir.

Q. How far apart were the two times you went in it?

A. About ten minutes apart.

Q. . . . Now you didn't have permission to go in there, and you said the first time you went in there, y'all just turned stuff over; is that what you said?

A. Yes, sir.

Q. What kind of stuff did y'all turn over?

A. The TV, the furniture, the microwave, the mattress, the deep freezer.

Q. . . . And the second time, what happened in that [sic]?

A. We burned – I burned the bed up and the seats, and I went and lit the couch up.

. . .

Q. Well, will you be honest with the jury today and tell the jury who went in this house and who did what?

A. Me. I – the reason why I changed the story cause I was – at first I was trying to get him [Barnes] locked up because I didn't want to go to jail for doing it, and he told me to man up about it and do the time so I just admitted to it, and I went to court.

Q. So you lit the matches?

A. Yes, sir.

Q. Or the lighter I guess, it was?

A. Yes, sir.

Q. Okay. And whose idea was it to go in and tear it up?

A. [Mine].

Q. Okay. Who went in there with you to tear it up?

A. Zachary Barnes.

Q. Okay. Did he play a role in that? Did he knock over any TVs or anything like that?

A. No, sir, he watched me.

Q. Okay. Did he know what you were doing?
A. Yes, sir.
. . .
Q. I heard you also say that [Barnes] said, Come on; let's go.
A. Yes, ma'am.
Q. Was he trying to get you out of there?
A. Yes, ma'am.
Q. Was he trying to stop you from what you were doing?
A. No, he just told me to come on; let's go; that was enough.
. . .
Q. When you were in the house with Zachary Barnes, were you two always together in there? I mean, like side by side?
A. No, sir, he stepped away.
Q. Stepped away?
A. Like he was by the front door, and I was running around the house.

¶13. Josett Busha lived next door to Michael Scott. She testified that she heard noises coming from Scott's apartment the night of the fire. It sounded like "banging around, throwing stuff into walls." She looked out her window and saw Darby and Barnes walk down the stairs and back across the street.[5] A few minutes later, Barnes walked back upstairs without Darby. And a few minutes after that, smoke came "shooting through [her] wall."

¶14. Brown testified that he was called to Scott's apartment the night of the fire to investigate. When he arrived, he noticed that there were several things "out of place"—a chair was upside down, a TV was on the floor, and the mattress was thrown off the bed. Brown testified that the firefighters could not have done this damage, because they did not make an "interior attack." He testified that his investigation was consistent with "things being thrown around." Brown also read the first two lines of Barnes's second statement to

_____

[5]Although Busha did not identify Darby and Barnes by name the night of the incident, she testified that she knew who they were and that they lived across the street, and she identified Barnes in court.

8

the jury: "I was with Charles when he set the fire. We went to the house and threw some things around."

¶15. The State rested after Brown's testimony. Barnes moved for a directed verdict, which the trial judge denied.

¶16. Barnes called one witness in his defense—Rebecca Henson. She testified that she was home the night of the fire, and that she looked out her kitchen window and saw "flames everywhere." Barnes had come back inside, and he was with her for about ten or fifteen minutes before she saw the fire. He had been with Darby. She did not know where Darby was at the time—he had gone back outside, and then he came back in.

¶17. Henson testified that Darby was a troubled child, and that he had started a dumpster fire when he was six or seven years old that resulted in them getting kicked out of an apartment complex. At the time of trial, Darby was in DHS's custody and was living at a mental hospital in Meridian.

¶18. Henson testified that Darby had told her and a lot of other people around the trailer park that he had done it. She also testified that Darby and Barnes both had told her that Barnes had stayed outside Scott's apartment:

> A. Charles said he went in the house and Zach was staying on the outside of the house.
> Q. So the defendant told you that he never went inside the house?
> A. My son told me that Zach Barnes never went in the house. He was staying on the outside of the house.
> Q. Did you talk to Zach about this incident?
> . . .
> A. Yeah, I talked to him about it. He told me everything about it. He said he was standing on the outside. He didn't say nothing about he went on the inside.

9

¶19. The defense rested after Henson's testimony. During the jury-instruction conference, the defense submitted instruction D-9, which was a lesser-included-offense instruction on trespass. After some discussion, the trial judge denied the requested instruction, stating that he did not think there was "evidence to support trespass when the defendant's own statement says that he went in and did this and that."

¶20. After deliberation, the jury found Barnes "guilty of burglary of a dwelling." The judge sentenced Barnes to twenty-five years in prison, with twenty years to serve and five years' post-release supervision. Barnes filed a Motion for Judgment [Notwithstanding the] Verdict And in the Alternative For a New Trial, which the trial judge denied. Barnes now appeals to this Court, arguing two points of error:

> (1) The trial court erred in refusing defense jury instruction D-9 which would have instructed the jury to consider the lesser-included offense of trespass; and

> (2) The trial court erred in failing to suppress Barnes' [s] statement as it was acquired with coercion and without requested counsel.

We find that the trial judge did not err when he declined to suppress Barnes's statement, but that he did err when he denied instruction D-9. We reverse and remand for a new trial based on that issue.

## ANALYSIS

### I. The trial judge did not err when he declined to suppress Barnes's statement.

¶21. On appeal, Barnes argues that his inculpatory statement should have been suppressed because he had requested counsel, and because Brown had promised him a reduced bond in exchange for it. We address these arguments separately.

#### A. Barnes's statement was not obtained in violation of his right to counsel.

10

¶22. "This Court will reverse a trial court's denial of a motion to suppress *only if* the ruling is manifest error or contrary to the overwhelming weight of the evidence." ***Barnes v. State***, 30 So. 3d 313, 316 (Miss. 2010) (citations omitted) (emphasis added).

¶23. In ***Downey v. State***, 144 So. 3d 146 (Miss. 2014), this Court stated:

> [I]f the defendant invokes h[is] right to counsel, the interrogation must cease until an attorney is present. If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived h[is] privilege against self-incrimination and h[is] right to retained or appointed counsel. Once a defendant asks for counsel, [he] cannot be interrogated further until counsel has been made available, unless the accused [himself] initiates further communication, exchanges, or conversations with the police.

***Id.*** at 150-51 (citing ***Barnes v. State***, 30 So. 3d 313, 316-17 (Miss. 2010)).

¶24. "The right to counsel may be invoked specifically in any manner and at any stage of the interrogation process." ***Downey***, 144 So. 3d at 151. "A defendant is not required to use specific language such as 'I want a lawyer,' in order to invoke the right to counsel." ***Id.*** "Once counsel is requested, the law enforcement officer cannot question the accused about [his] criminal conduct." ***Id.*** "However, the officer is permitted to inquire about counsel for clarification purposes." ***Id.***

¶25. "If a defendant ambiguously requests counsel, any subsequent clarifying statements must not 'coerce or intimidate the suspect into waiving [his] rights.'" ***Id.*** at 152 (citations omitted). "Determining the limits of clarification is fact specific. A significant question is whether the interrogator *infringed on the defendant's desire to stop the interrogation*." ***Id.*** (citations omitted) (emphasis added). "If interrogation continues outside the presence of the requested counsel, the State bears a heavy burden of proving beyond a reasonable doubt that

11

the defendant validly waived the right to counsel and the privilege against self-incrimination." *Id.* "Specifically, the State must show the defendant 'voluntarily, knowingly, and intelligently' waived [his] *Miranda* rights." *Id.* at 153.

¶26. Here, Barnes ambiguously requested counsel when he said "maybe I should get an attorney." Once that occurred, Brown was entitled to clarify Barnes's request for counsel. Brown testified at the suppression hearing that:

> A. He did make references to maybe I should get an attorney. I referenced him back to the *Miranda* that he signed and said, You have every right to have that. We can stop this at any time and wait for your attorney to be present.
> . . .
> Q. I was just curious if the way [Barnes] said the statement to you, did that give you any indication on whether he was asking or requesting or anything like that? Because, you know, sometimes you can say something, and one way it's a question, and one way it's a demanding statement.
> A. No, I stopped and gave him the option.
> Q. Okay. I'm curious then what do you need to hear to stop a conversation like this in regards to requesting an attorney?
> A. I'm not going to answer any more questions; I want my attorney.
> Q. It has to be that exactly?
> A. Well, not exactly but, I mean, thereabout, yes. I mean, we stopped several times during the interview, and, you know, I kept referring back to the *Miranda* that he signed. It says, you have this option right here. We can stop at any time.
> Q. So if you stopped several times, did he reference it several times, or did you just decide to take breaks?
> A. He referenced it a couple of times just maybe I should have an attorney. I said, that's strictly your option. We can stop this at any time.

¶27. In sum, Barnes made an ambiguous request for counsel. Brown then attempted to clarify whether Barnes was actually requesting counsel by reminding him that he had every right to do so and that the interview could be stopped at any time to wait for an attorney. There is no indication from the record that Brown made any comments that it might take some time for Barnes's attorney to arrive, which is what this Court found inappropriate in

12

*Downey*. *Id.* at 152. Barnes's decision to continue the interview—after already having signed and initialed a *Miranda* waiver and being reminded that he could have an attorney at any time—indicates a "voluntary, knowing and intelligent" waiver of his right to counsel. *Downey*, 144 So. 3d at 153. As such, we cannot say that the trial judge's decision not to suppress Barnes's statement was "manifest error or contrary to the overwhelming weight of the evidence." *Barnes v. State*, 30 So. 3d at 316.

**B. Barnes was not offered some "hope of reward."**

¶28. This Court repeatedly has condemned "the practice whereby law enforcement interrogators, or related third parties, convey to suspects the impression, however slight, that cooperation by the suspect might be of some benefit." *Abram v. State*, 606 So. 2d 1015, 1031 (Miss. 1992), *overruled on other grounds* by *Foster v. State*, 961 So. 2d 670 (Miss. 2007). "A confession made after the accused has been offered some hope of reward if he will confess or tell the truth cannot be said to be voluntary." *Id.* at 1032 (citations omitted).

¶29. Clearly, this Court will not uphold a confession that was given in return for some "hope of reward." But as stated above, this Court also will reverse a trial court's denial of a motion to suppress *only if* the ruling is "manifest error or contrary to the overwhelming weight of the evidence." *Barnes*, 30 So. 3d at 316. The trial judge heard Barnes's testimony that Brown had promised him a bond reduction if he would write down what Darby told him to write. But the trial judge also heard Brown's testimony in which he unequivocally denied promising Barnes a bond reduction in exchange for his statement.

¶30. This Court has stated that the voluntariness of a confession is a "fact-finding function." *Morgan v. State*, 681 So. 2d 82, 87 (Miss. 1996) (citations omitted). "So long

13

as the court applies the correct legal standards, 'we will not overturn a finding of fact made by a trial judge unless it be clearly erroneous.'" ***Id.*** "Where, on conflicting evidence, the court makes such findings this Court generally must affirm." ***Id.*** Here, Barnes and Brown offered conflicting testimony, but it was within the trial judge's province to determine their credibility. He decided that the evidence did not warrant suppression of Barnes's statement, and we find that that decision was not "clearly erroneous."

## II. The trial court should have granted Instruction D-9.

¶31. When a defendant claims that he was entitled to a lesser-included-offense instruction, this Court conducts a de novo review. ***Jackson v. State***, 90 So. 3d 597, 605 (Miss. 2012).

¶32. "[A] lesser included offense instruction should be granted unless the trial judge—and ultimately this Court—can say, *taking the evidence in the light most favorable to the accused, and considering all reasonable favorable inferences which may be drawn in favor of the accused from the evidence*, that no reasonable jury could find the defendant guilty of the lesser-included offense (and conversely not guilty of at least one essential element of the principal charge)." ***Id.*** (citation omitted) (emphasis added).

¶33. A criminal defendant "is entitled to have jury instructions given which present his theory of the case." ***Clayton v. State***, 106 So. 3d 802, 804 (Miss. 2012) (citation omitted). But the trial court may refuse a proffered jury instruction if: (1) the instruction "incorrectly states the law," (2) the instruction "is covered fairly elsewhere in the instructions," or (3) the instruction "is without foundation in the evidence." ***Id.*** This Court consistently has articulated a low threshold with regard to what the defendant must show in the record to support a tendered "theory-of-the-case" instruction. "A defendant is entitled to have

14

instructions on his theory of the case presented, even though the evidence that supports it is weak, inconsistent, or of doubtful credibility." *Banyard v. State*, 47 So. 3d 676, 681 (Miss. 2010) (quoting *Ellis v. State*, 778 So. 2d 114, 118 (Miss. 2000)). "Implicit in every conviction of burglary is the finding that the defendant committed a trespass." *Clayton*, 106 So. 3d at 804 (citation omitted).

¶34. Although Barnes does not cite a specific trespass statute on appeal, his proposed jury instruction D-9 tracks the language of the "willfull or malicious trespass" statute. Mississippi Code Section 97-17-87 states:

> Any person who shall be guilty of a *willful or malicious trespass* upon the real or personal property of another, for which no other penalty is prescribed, shall, upon conviction, be fined not exceeding Five Hundred Dollars ($500.00), or imprisoned not longer than six (6) months in the county jail, or both.

Miss. Code. Ann. § 97-17-87(1) (Rev. 2014) (emphasis added). The relevant portion of Barnes's proposed jury instruction states: "If you are convinced from the evidence beyond a reasonable doubt that: (1) On or about May 3, 2012, in Forrest County, Mississippi; (2) Zachary Barnes; (3) Unlawfully and willfully; (4) Trespassed on the real or personal property of another, then you shall find ZACHARY BARNES guilty of the crime of willful trespass."

¶35. Barnes's proffered instruction was a correct statement of the law. And trespass was not covered anywhere else in the instructions. We find sufficient evidence to support a trespass instruction in the record, especially in light of this Court's low threshold. Darby testified that it was his idea to go to Scott's apartment and vandalize it. He also testified that Barnes was in the apartment with him, but that Barnes only watched him throw things around. Barnes said "let's go" to Darby, and he stayed by the front door while Darby was

"running around" the apartment. And Henson testified that Darby and Barnes both had told her that Barnes had stayed outside Scott's apartment during the incident. Based on this testimony, we find more than enough evidence to support a trespass instruction.

## CONCLUSION

¶36. The trial judge did not err when he declined to suppress Barnes's statement, but we find that the trial judge did err when he denied Barnes's lesser-included-offense instruction. We reverse the judgment of the Forrest County Circuit Court and remand the case for a new trial consistent with this opinion.

¶37. **REVERSED AND REMANDED.**

**DICKINSON AND RANDOLPH, P.JJ., KITCHENS, CHANDLER, PIERCE AND COLEMAN, JJ., CONCUR. KING, J., CONCURS IN PART AND IN RESULT WITHOUT SEPARATE WRITTEN OPINION. WALLER, C.J., NOT PARTICIPATING.**