# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-KA-00594-COA

**FRED HILL, III**                                                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                              **APPELLEE**

DATE OF JUDGMENT:                02/17/2016
TRIAL JUDGE:                     HON. DAVID H. STRONG JR.
COURT FROM WHICH APPEALED:       LINCOLN COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:          M.A. BASS JR.
ATTORNEY FOR APPELLEE:           OFFICE OF THE ATTORNEY GENERAL
                                 BY: JOSEPH SCOTT HEMLEBEN
DISTRICT ATTORNEY:               DEE BATES
NATURE OF THE CASE:              CRIMINAL - FELONY
DISPOSITION:                     AFFIRMED - 09/12/2017
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE LEE, C.J., ISHEE AND FAIR, JJ.**

**LEE, C.J., FOR THE COURT:**

## PROCEDURAL HISTORY

¶1.    A jury in the Lincoln County Circuit Court convicted Fred Hill of first-degree murder, shooting into a dwelling, and felon in possession of a firearm. Hill was sentenced to life imprisonment for the murder conviction, and five years each for the other two convictions. All three sentences were ordered to be served consecutively in the custody of the Mississippi Department of Corrections, and Hill was ordered to pay an $8,000 fine and $6,000 restitution to the Crime Victims' Compensation Fund. Hill's posttrial motions were denied, and he now appeals, asserting the following issues: (1) the evidence was legally insufficient; (2) the jury

verdict is against the overwhelming weight of the evidence; and (3) the trial court erred in denying his two motions to suppress.

**FACTS**

¶2.    On April 1, 2015, around 11:30 p.m., Hill drove up to Ezzard and Gwendolyn Campbell's trailer located on Spur Road in Lincoln County.  According to both Ezzard and Gwendolyn, a car horn woke them up and, upon looking outside, they saw Hill standing beside the car holding a rifle.  Both Ezzard and Gwendolyn testified that Hill asked where Timothy Green was, then said, "I'm going to kill him."  Green is Ezzard's son and Gwendolyn's stepson.  Hill then got back in the car and drove home, which was approximately 400 yards from the Campbells' home.  Ezzard testified that he followed Hill home to determine why Hill was angry with Green.  Ezzard said Hill told him that Green was trying to steal Hill's girlfriend, Keirra Magee.[1]  Ezzard then returned home.  Ezzard heard Hill return sometime later.  Both Ezzard and Gwendolyn saw Hill run between their trailer and their daughter's trailer next door.  They then heard two gunshots and saw Hill run back to his car carrying a rifle.  Green's body was discovered in the area between the Campbells' trailer and their daughter's trailer.

¶3.    Green had two bullet wounds; one entered the upper-left chest area, and the other entered the back of his left shoulder.  Dr. Lisa Fuente, from the state medical examiner's office, performed an autopsy on Green and noted that either bullet wound could have resulted in Green's death.

---

[1] By the time of Hill's trial, he and Magee were married.

¶4. One of the Campbells' neighbors, Jessica Matlock, had also seen Hill at the Campbells' trailer that night. Matlock, watching from a window in her trailer, saw Hill drive up and exit the car. She saw him carrying a gun and a flashlight. Hill then walked toward the Campbells' trailer. Matlock testified that she heard two gunshots, then saw Hill running back toward the car.

¶5. Several members of the Lincoln County Sheriff's Department responded to the scene, including Deputy Patrick Hardy, Chief Deputy Johnny Hall, Investigator Damian Gatlin, and Investigator Byron Catchings. Two .223-caliber shell casings were recovered from the area near Green's body, and a .223-caliber bullet was recovered from a bullet hole in the side of the Campbells' trailer. After Hill became a suspect and his house was searched, the police found several .223-caliber shell casings in his house and in the yard. However, lab tests could not determine if all of the .223-caliber shell casings recovered from both Hill's house and the crime scene had been fired from the same gun. The murder weapon was never found.

¶6. Hill was first interviewed by Deputy Hall and Investigator Gatlin, and he denied involvement in Green's death. Deputy Hall testified that after he had walked Hill to the booking area, Hill confessed to the crime, but recanted a few minutes later. Hill was also interviewed by Investigator Catchings. Investigator Catchings, who recorded the interview with Hill, testified that he was trying to determine if Magee was involved in Green's murder. Investigator Catchings stated that Hill said he shot Green, but Magee was not involved and was not with Hill when he disposed of the gun. Investigator Catchings then spoke with Magee, and she told him where Hill disposed of the gun. Hill also told Investigator

3

Catchings where he threw away the gun. Investigator Catchings, another deputy, and Magee then went to search for the gun, but it was never recovered.

¶7.     A gunshot-residue test was conducted on samples taken from Hill's hands and the car he was driving, which belonged to Magee. Particles indicative of gunshot residue were found on the car's steering wheel and door handle, but no gunshot residue was found on Hill's hands.

¶8.     Hill admitted that he drove to the Campbells' house that night and honked the horn, but did not exit the car or threaten to kill Green. Hill denied involvement in Green's death. Hill testified that he and Magee had gone to her mother's house to avoid Green. According to Hill, Green had tried to break into their house while Magee and their children were home. Hill also testified that while he was in custody, the deputies threatened to arrest Magee for Green's murder. They also handcuffed Magee and led her past Hill while he was in a holding area in order to provoke him into confessing to Green's murder.

¶9.     According to Deputy Hall, Magee was in the booking area when Hill was in a holding cell nearby. But Deputy Hall testified that Magee had not been arrested and was not in handcuffs.

**DISCUSSION**

## I.     Insufficient Evidence

¶10.    In his first issue, Hill argues that the evidence was legally insufficient; thus, the trial court erred in denying his motion for a directed verdict, his request for a peremptory instruction, and his motion for a judgment notwithstanding the verdict (JNOV).

4

¶11.    "The standard of review for a denial of a directed verdict, peremptory instruction, and a JNOV are identical." *Hawthorne v. State*, 835 So. 2d 14, 21 (¶31) (Miss. 2003).  All challenge the legal sufficiency of the evidence. *McClain v. State*, 625 So. 2d 774, 778 (Miss. 1993).  "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Bush v. State*, 895 So. 2d 836, 843 (¶16) (Miss. 2005).  "We review a challenge to the sufficiency of the evidence on the last occasion that the trial court ruled on the sufficiency of the evidence." *Henley v. State*, 136 So. 3d 413, 416 (¶8) (Miss. 2015).  In this case, the last occasion on which the trial court ruled on the sufficiency of the evidence was in its denial of Hill's motion for a JNOV.

¶12.    Mississippi Code Annotated section 97-3-19(1)(a) (Supp. 2016) defines first-degree murder as "[t]he killing of a human being without the authority of law by any means or in any manner . . . when done with deliberate design to effect the death of the person killed, or of any human being[.]"  The State must prove beyond a reasonable doubt that: "(1) the defendant killed the victim; (2) without authority of law; and (3) with deliberate design to effect his death." *Brown v. State*, 965 So. 2d 1023, 1030 (¶27) (Miss. 2007) (quotations omitted).  Mississippi Code Annotated section 97-37-29 (Rev. 2014) states: "If any person shall willfully and unlawfully shoot or discharge any . . . firearm of any nature or description into any dwelling house or any other building usually occupied by persons, whether actually occupied or not, he shall be guilty of a felony whether or not anybody be injured . . . ."

¶13.    Hill claims that insufficient lighting in the area created reasonable doubt as to the

5

shooter's identity. However, there was testimony from Ezzard, Gwendolyn, and Matlock that even though it was dark outside, several outdoor lights illuminated the area. Although no one saw Hill shoot Green, these three witnesses saw Hill carrying a gun to the area where Green's body was found, heard two shots, and then saw Hill flee the area. Furthermore, both Ezzard and Gwendolyn testified that Hill told them he was looking for Green and wanted to kill him. Gwendolyn also heard a "ding" that she thought was a bullet hitting their trailer. And a bullet was removed from a bullet hole in the side of the Campbells' trailer.

¶14.    Hill claims that the Campbells' testimony was biased due to their familial relationship with Green. However, the jury determines the credibility of witnesses and resolves conflicts in the evidence. *Davis v. State*, 866 So. 2d 1107, 1112 (¶17) (Miss. Ct. App. 2003). Here, the jury found the Campbells' testimony more credible. Viewing the evidence in the light most favorable to the State, a rational juror could have found beyond a reasonable doubt that Hill was guilty of murder and shooting into a dwelling.[2] This issue is without merit.

## II.    Overwhelming Weight of the Evidence

¶15.    A motion for a new trial challenges the weight of the evidence. *Hawthorne*, 835 So. 2d at 21 (¶31). When reviewing a denial of a motion for a new trial, this Court "will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Bush*, 895 So. 2d at 844 (¶18) (citation omitted). Hill's arguments are identical to those expressed in the previous issue. From the evidence previously described, we cannot find that allowing the verdict to stand

---

[2] Hill's argument does not address his conviction for possession of a firearm.

would sanction an unconscionable injustice. This issue is without merit.

### III. Motions to Suppress

¶16.    Hill argues that the trial court erred in denying his motion to suppress statements he made to the police and his motion to suppress evidence obtained from the search of Magee's car. "This Court will reverse a trial court's denial of a motion to suppress only if the ruling is manifest error or contrary to the overwhelming weight of evidence." *Barnes v. State*, 158 So. 3d 1127, 1134 (¶22) (Miss. 2015) (emphasis omitted).

### A. Statements to Police

¶17.    Hill claims that any incriminating statements he made to the police were coerced because the police threatened to arrest Magee. During the suppression hearing, Deputy Hall testified that at the formal interview Hill denied shooting Green. But while Hill was being booked into the jail, Hill said Matlock (the Campbells' neighbor) lured Green from the woods and he then shot Green twice. Deputy Hall stated that he asked Hill where he disposed of the gun, and Hill responded by denying involvement. On cross-examination, Deputy Hall was asked whether he informed Hill that Magee would be arrested unless he cooperated. Deputy Hall responded that he told Hill that Magee could in fact be arrested, but not to coerce Hill into confessing. Deputy Hall stated that Magee was being questioned about her role in Green's murder, but it was determined that she was not a suspect. Deputy Hall denied handcuffing Magee and marching her in front of Hill and stated that she was never in the same area of the police station as Hill.

¶18.    Investigator Catchings testified he had information at the time indicating that Magee

was in the car with Hill immediately after the shooting; thus, it was possible that Magee was involved in Green's murder. Investigator Catchings further stated that Hill's incriminating statements to him were voluntary and no threats or promises were made to coerce him into confessing.

¶19. Magee testified that she was handcuffed and walked past Hill. Once Hill saw Magee, she heard him say, "no, no, you [are] not going to jail." Magee further denied knowledge of the gun's location.

¶20. In denying Hill's motion to suppress, the trial court stated,

> I have no doubt that it was paramount in [Hill's] mind that [Magee] . . . not be charged with anything. And there is some evidence that threats were made against [Magee] . . . that she may be charged with a crime. However, I haven't heard any evidence that those threats were made objectively. I think that the threats perceived by [Hill] were just that, perceived by him. I find that [Hill] was properly Mirandized, that he waived his *Miranda*[3] rights, and . . . whatever statement he gave, the Court finds was freely, voluntarily given, without coercions or threats or under duress. And that those statements will be admissible at a trial of this matter.

¶21. The Mississippi Supreme Court has held that "[t]hreats to arrest a defendant's family member(s) do not render a confession involuntary so long as probable cause exists to arrest such persons." *Armstead v. State*, 978 So. 2d 642, 648 (¶26) (Miss. 2008). At the time Hill was interviewed, the police had information that the car used in the crime was registered to Magee, and Magee might have been in the car with Hill immediately after the shooting. We find that the trial court did not manifestly err by holding, from the totality of the circumstances, that any statements regarding Magee did not induce Hill's incriminatory

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

8

statements.

### B. Search of Magee's Car

¶22. Hill argues that the police needed to produce the consent-to-search form or show that exigent circumstances existed to search Magee's car. Although Magee did not testify regarding the consent-to-search issue, a stipulation was entered stating she would testify that she did not consent to the search.

¶23. Consent to search is recognized as an exception to the requirements of a warrant and probable cause. *Moore v. State*, 933 So. 2d 910, 916 (¶18) (Miss. 2006). "Whether a person voluntarily consents to a search is a question of fact to be determined by the total circumstances." *Id.* at (¶20) (internal quotation marks and citation omitted). "The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois*, 439 U.S. 128, 132 n.1 (1978); *see also White v. State*, 571 So. 2d 956, 958-59 (Miss. 1990).

¶24. The State argues that Hill does not have standing to object since he did not own the car. *See Walker v. State*, 962 So. 2d 39, 41 (¶7) (Miss. Ct. App. 2006) (a passenger who does not own the car being searched cannot complain about the legality of the search); *Head v. State*, 246 Miss. 203, 207, 136 So. 2d 619, 621 (1962) ("Since the defendants were not in possession of the automobile, either in the control or ownership of the car, they have no right to raise the constitutional question of [the] search."). However, in *Powell v. State*, 824 So. 2d 661, 664-65 (¶15) (Miss. Ct. App. 2002), this Court found that a defendant did have a reasonable expectation of privacy in his girlfriend's car; thus, the defendant had standing to

9

challenge the search of the car. There was evidence that: the car was the defendant's principal and usual mode of transportation; the defendant had the implicit right to exclude others from using the car; and the defendant had a possessory interest in the car. *Id*.

¶25. Although the trial court determined that Hill did have standing to object to the legality of the search, we note that, unlike *Powell*, Hill did not offer any testimony showing that he had a possessory interest in Magee's car or that the car was his principal and usual mode of transportation. Even if Hill had standing, the trial court found that, based on the totality of the circumstances, the testimony of Investigator Catchings and Deputy Whitaker that Magee consented to the search was credible. Investigator Catchings testified that Magee told him that Hill was driving her car the night of April 1, 2015. Investigator Catchings then asked Magee for permission to search her car, which Magee had driven to the police station. Magee consented and the gunshot-residue test was conducted on samples taken from the car. Investigator Catchings admitted that the consent-to-search form had been misplaced, but that Magee had verbally consented to the search. Another sheriff's deputy, John Whitaker, testified that he was present when Magee verbally consented to the search and signed the form. From the totality of the circumstances, we find the trial court did not err in denying Hill's motion to suppress.

¶26. **AFFIRMED.**

**IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, FAIR, WILSON, GREENLEE AND WESTBROOKS, JJ., CONCUR.**

10